
SEALED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2014 JUN 19  PM 3: 43

DEPUTY CLERK_____

**UNITED STATES OF AMERICA**
*ex. rel.* **BECKY RAMSEY-LEDESMA,**

        **Plaintiff,**

v.                                                          **CASE NO. 3:14-CV-0118-M**

**CENSEO HEALTH, L.L.C., MARK** §
**DAMBRO, JAMES EDWARD BARRY** §
**GREVE, JR., JOY RIDLEHUBER,** §
**ALTEGRA HEALTH, INC., BLUE** §
**CROSS BLUE SHIELD ALABAMA,** §
**BLUE CROSS OF IDAHO, BLUE** §
**CROSS BLUE SHIELD TENNESSEE,** §
**CARE PLUS HEALTH PLANS, INC.,** §
**CHINESE COMMUNITY HEALTH** §
**PLAN, COMMONWEALTH CARE** §
**ALLIANCE, COMMUNITY HEALTH** §
**PLAN OF WASHINGTON, COVENTRY** §
**HEALTH CARE, INC., HEALTH NET,** §
**INC., HIGHMARK BLUE CROSS BLUE** §
**SHIELD, HILL PHYSICIANS MEDICAL** §
**GROUP, INC., HUMANA INC., NORTH** §
**TEXAS SPECIALTY PHYSICIANS,** §
**NEW WEST HEALTH SERVICES,** §
**PACIFICSOURCE HEALTH PLANS,** §
**PARAMOUNT CARE, INC., PEOPLES** §
**HEALTH, INC., PRIORITY HEALTH,** §
**TUFTS HEALTH PLAN MEDICARE** §
**PREFERRED, UNIVERSAL AMERIAN** §
**MEDICARE, VIVA HEALTH, INC.,** §
**WELLCARE HEALTH PLANS, INC.** §
**and DOES 1-10,** §
                                        §
                                        §   **FILED IN CAMERA**
        **Defendants.** §   **AND UNDER SEAL**

---

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

        Plaintiff Becky Ramsey-Ledesma ("Ramsey"), filing as Qui Tam Relator on behalf of the

United States of America, asserts the following claims arising under the Federal False Claims

Act [31 U.S.C. § 3729, *et seq.*] against Defendants Censeo Health, L.L.C. ("Censeo"), Mark Dambro ("Dambro"), James Edward Barry Greve, Jr. ("Greve"), Joy Ridlehuber ("Joy Ridlehuber"), Altegra Health, Inc. ("Altegra"), Blue Cross Blue Shield Alabama ("BC-Alabama"), Blue Cross of Idaho ("BC-Idaho"), Blue Cross Blue Shield Tennessee ("BC-Tennessee"), Care Plus Health Plans, Inc. ("CarePlus"), Chinese Community Health Plan ("CCHP"), Commonwealth Care Alliance ("Commonwealth"), Community Health Plan of Washington ("CP Washington"), Coventry Health Care, Inc. ("Coventry"), Health Net, Inc. ("Health Net"), Highmark Blue Cross Blue Shield ("Highmark'), Hill Physicians Medical Group, Inc. ("Physicians"), Humana Inc. ("Humana"), North Texas Specialty Physicians ("NTSP"), New West Health Services ("New West"), PacificSource Health Plans ("PacificSource"), Paramount Care, Inc. ("Paramount"), Peoples Health, Inc. ("Peoples"), Priority Health ("Priority"), Tufts Health Plan Medicare Preferred ("Tufts"), Universal American Medicare ("UAM"), Viva Health, Inc. ("Viva"), WellCare Health Plans, Inc. ("WellCare"), and Does 1-10, inclusive.

## I.

## **THE PARTIES**

1.     Plaintiff and Qui Tam Relator Ramsey is a citizen of the United States and the State of Texas and resides in this District.  Ramsey is filing here as Qui Tam Relator on behalf of and in the name of the United States ("Government") under the authority conferred by 31 U.S.C. § 3730(b), seeking damages and civil penalties against the Defendants for violations of 31 U.S.C. § 3729(a).

2.     Defendant Censeo is a limited liability company formed under the laws of the State of Delaware and having its principal place of business at 4055 Valley View Ln., Suite 400,

Dallas, Texas 75244. Censeo may be served with process by serving its registered agent, Capitol Services, Inc., 1675 S. State Street, Suite B, Dover, Delaware 1980

3.    Defendant Dambro is an individual residing at 2405 Stadium Drive, Fort Worth, Texas 76109-1055 and may be served with process at this residence. At all times relevant hereto, Defendant Dambro was Censeo's Chief Medical Officer.

4.    Defendant Greve is an individual residing at 4916 Bridgewater Drive, Arlington, Texas 76017-2728 and may be served with process at this residence. At all times relevant hereto, Defendant Greve was Censeo's Chief Compliance Officer.

5.    Defendant Ridlehuber is an individual residing at 2311 Eastgate Drive, Carrollton, Texas 75006 and may be served with process at this residence. At all times relevant hereto, Defendant Ridlehuber was Censeo's Director of Quality.

6.    Defendant Altegra is a Delaware corporation having its principal place of business at 14261 Commerce Way, Miami Lakes, Florida 33016-1556. Altegra may be served with process by serving its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

7.    Defendant BC-Alabama is a non-profit Alabama corporation having its principal place of business at 450 Riverchase Parkway East, Birmingham, Alabama 35244. BC-Alabama may be served with process by serving the Alabama Department of Insurance, 201 Monroe Street, Suite 502, Montgomery, Alabama 36104.

8.    Defendant BC-Idaho is a non-profit Idaho corporation having its principal place of business at 3000 E. Pine Avenue, Meridian, Idaho 83642. BC-Idaho may be served with process by serving its registered agent, Steven J. Tobiason, 3000 E. Pine Avenue, Meridian, Idaho 83642.

9.      Defendant BC-Tennessee is a Tennessee non-profit corporation with its principal place of business at 1 Cameron Hill Circle, Chattanooga, Tennessee 37402-9815. BC-Tennessee may be served with process by serving its registered agent, William A. Hullender, 1 Cameron Hill Circle, Chattanooga, Tennessee 37402-9815.

10.     Defendant CarePlus is a Florida corporation having its principal place of business at 11430 NW 20th St, Miami, Florida 33172. CarePlus may be served with process by serving its registered agent, Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301-2525.

11.     Defendant CCHP is a California corporation having its principal place of business at 445 Grant Avenue, Suite 700, San Francisco, California 94108. CCHP may be served with process by serving its registered agent, Brenda Yee, 445 Grant Avenue, Suite 700, San Francisco, California 94108.

12.     Defendant Commonwealth is a nonprofit corporation organized under the laws of the Commonwealth of Massachusetts and has its principal place of business at 30 Winter Pl., Boston, Massachusetts 02108. Commonwealth may be served with process by serving its registered agent, Lisa M. Fleming, 30 Winter Pl., Boston, Massachusetts 02108.

13.     Defendant CP Washington is a nonprofit corporation organized under the laws of the State of Washington and has its principal place of business at 720 Olive Way #300, Seattle, Washington 98101. CP Washington may be served with process by serving its registered agent, Corporations Service Company, 300 Deschutes Way SW, Suite 304, Tumwater, Washington 98501.

14.     Defendant Coventry is a corporation organized under the laws of the State of Delaware and has its principal office at 6705 Rockledge Drive, Suite 900, Bethesda, Maryland

20817-7828. Coventry may be served with process by serving its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

15. Defendant Health Net is a corporation organized under the laws of the State of Delaware and has its principal place of business at 21650 Oxnard St, Woodland Hills, California. Health Net may be served with process by serving its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

16. Defendant Highmark is a non-profit corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at 1800 Center Street, Camp Hill, Pennsylvania 17011. Highmark may be served with process by serving William Winkenwerder, its President and Chief Executive Officer, at 1800 Center Street, Camp Hill, Pennsylvania 17011.

17. Defendant Physicians is a California corporation with its principal place of business at 2409 Camino Ramon, San Ramon, California 94583. Physicians may be served with process by serving its registered agent, Paul A. Stewart, 975 Page Mill Road, Palo Alto, California 94304.

18. Defendant Humana is a Delaware corporation with its principal place of business at 500 West Main Street, Louisville, Kentucky 40202. Humana may be served with process by serving its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

19. Defendant NTSP is a Texas domestic nonprofit corporation with its principal place of business at 1701 River Run #210, Fort Worth, Texas 76107. NTSP may be served with

process by serving its registered agent, Karen Van Wagner, 1701 River Run Road, Suite 210, Fort Worth, Texas 76107.

20.     Defendant New West is a Montana corporation with its principal place of business at 130 Neill Ave, Helena, Montana 59601. New West may be served with process by serving its registered agent, Anna Albertson, 130 Neill Avenue, Helena, Montana 59601.

21.     Defendant PacificSource is an Oregon nonprofit corporation with its principal place of business at 110 International Way, Springfield, Oregon 97477. PacificSource may be served with process by serving its registered agent, Kristin Kernutt, 110 International Way, Springfield, Oregon 97477.

22.     Defendant Paramount is an Ohio non-profit corporation with its principal place of business at 1901 Indian Wood Cir., Maumee, Ohio 43537. Paramount may be served with process by serving its registered agent, Jefffrey C. Kuhn, 1801 Richards Rd., Toledo, Ohio 43607.

23.     Defendant Peoples is a Louisiana corporation with its principal place of business at 3838 N. Causeway Blvd #2200, Metairie, Louisiana 70002. Peoples may be served with process by serving its registered agent, Carol A. Solomon, 3838 N. Causeway Blvd., Suite 2200, Metairie, Louisiana 70002.

24.     Defendant Priority is a Michigan nonprofit corporation with its principal place of business at 1231 East Beltline NE, Grand Rapids, Michigan 49525. Priority may be served with process by serving its registered agent, Kimberly Thomas, 1231 East Beltline NE, Grand Rapids, Michigan 49525.

25.     Defendant Tufts is a Massachusetts nonprofit corporation with its principal place of business at 705 Mount Auburn Street, Watertown, Massachusetts 02472-1508. Tufts may be

served with process by serving one of its officers at 705 Mount Auburn Street, Watertown, Massachusetts 02472-1508.

26.     Defendant UAM is a Delaware corporation with its principal place of business at 44 South Broadway, Suite 1200, White Plains, New York 10601-4411.  UAM may be served with process by serving its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

27.     Defendant Viva is an Alabama nonprofit corporation with its principal place of business at 417 20th Street North, Suite 1100, Birmingham, Alabama 35203.  Viva may be served with process by serving its registered agent, Brad Rollow, 417 20th Street North, Suite 1100, Birmingham, Alabama 35203.

28.     Defendant WellCare is a Delaware corporation with its principal place of business at 8725 Henderson Road, Tampa, Florida 33634.  WellCare may be served with process by serving its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle, Delaware 19801.

29.     The true nature and capacity of Defendants sued and named herein as Does 1 through 10, inclusive, are unknown to Plaintiff, who therefore sues such Defendants under such fictitious names.  Does 1 through 10 are Medicare Advantage Organizations ("MAOs"), and their officers, employees, and agents, who have knowingly participated in submitting false or fraudulent claims to the Government and have conspired with the remaining Defendants to violate 31 U.S.C. § 3729(a)(1)(A),(B) and (G).   Plaintiff will amend this complaint to state the true names and capacities of Does 1 through 10 when such have been fully ascertained.

30.     Defendants   BC-Alabama,   BC-Idaho,   BC-Tennessee,   CarePlus,   CCHP, Commonwealth, CP Washington, Coventry, Health Net, Highmark, Physicians, Humana, NTSP,

New West, PacificSource, Paramount, Peoples, Priority, Tufts, UAM, Viva, Wellcare, and Does 1 through 10 are collectively referred to herein as the "Censeo MAOs."

## II.

### JURISDICTION AND VENUE

31.     This Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

32.     Venue is proper in this District and Division pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b).

## III.

### FACTUAL ALLEGATIONS COMMON TO EACH COUNT

A.     **Medicare Advantage Organizations:**

33.     Medicare, enacted in 1965 as Title XVIII of the Social Security Act, is a federally funded and administered health insurance program benefitting those who are age 65 and older and the disabled. 42 U.S.C. § 1395c & j, *et seq.*  Medicare Parts A and B are fee-for-service insurance programs that cover inpatient and outpatient care, respectively. In 1997, Congress enacted Medicare Part C to allow Medicare beneficiaries to opt out of traditional fee-for-service coverage. 42 U.S.C. § 1395w-21, *et seq.*  Under Part C, beneficiaries can enroll in Medicare Advantage plans, which are privately-run managed care plans that provide coverage for both inpatient and outpatient services.

34.     Under Medicare Part C, also known as the Medicare Advantage program, beneficiaries can opt to receive their Medicare benefits through a private health plan. Currently, more than 13 million beneficiaries are enrolled in Medicare Advantage plans. Part C Medicare

Advantage plans are administered by insurance carriers known as Medicare Advantage Organizations, or MAOs.  The Censeo MAOs are Medicare Advantage Organizations.

35.     In 2003, Congress created Medicare Part D, which provides partial coverage for prescription drugs.  Since the implementation of Part D, many MAO plans also provide coverage for prescription drugs. 42 U.S.C. § 1395w-101, *et seq.*

36.     The Center for Medicare and Medicaid Services ("CMS"), a division of the Department of Health and Human Services, is responsible for the administration and supervision of the Medicare program.

37.     MAOs such as the Censeo MAOs must be approved by CMS and operate under strict guidelines. The Master Application contains a certification that the Applicant "agrees to abide by the terms of the Medicare Advantage Contract and/or contract addendum." This includes, *inter alia*, the following, all of which are incorporated herein: (a) Social Security Act 42 U.S.C. § 1395 *et seq.*, (b) Medicare regulations, 42 CFR Part 422 *et seq.*, and (c) the Medicare Managed Care Manual.  As required by their Applications, the Censeo MAOs made and regularly reaffirmed numerous express "attestations," including attestations that they would implement a compliance program in accordance with the requirements of 42 C.F.R. § 422.503(b)(4)(vi) "which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse."

38.     To qualify as an MAO, to be eligible to enroll Medicare beneficiaries in the MAO plan it sponsors and to be paid on behalf of Medicare beneficiaries enrolled in such plan, a Medicare Advantage Organization must enter into a contract with CMS. 42 C.F.R. § 422.503(a). The contract must contain certain mandatory provisions, including the following:

That it [the MAO] will be paid under the contract in accordance with the payment rules in subpart G of this part [42 C.F.R. § 422.504(a)(9)]; and

**As a condition for receiving a monthly payment under subpart G of this part,** the MA organization agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of relevant data that CMS requests. [42 C.F.R. § 422.504(a)(l) (emphasis added)]

39.     Among the information that an MAO's CEO, CFO or authorized direct report must certify as accurate, complete and truthful as a condition to the MAO's receiving payment is the risk assessment data that the MAO submits to CMS for the latter's use in calculating capitation payments. 42 C.F.R. §§ 422.504(a)(l)(1)-(a)(1)(3). When a subcontractor generates the risk assessment data, it must "similarly certify" the accuracy, truthfulness and completeness of such data. 422.504(a)(l)(3) .

**B.     How CMS Determines An MAO's Monthly Capitation Payment:**

40.     CMS makes prospective monthly risk-adjusted capitation payments to each MAO in exchange for the latter's providing health care and prescription drug coverage to Medicare Advantage enrollees.

41.     Initially, Medicare capitation payments to MAOs were based solely on available demographic information. In 2004, in an effort to improve the accuracy and fairness of its capitation payments to MAOs, CMS implemented a new payment model that factors the health risk (i.e., diagnoses), of the patients serviced by an MAO into the payments made by CMS to that MAO.   The new payment model, often referred to as the CMS-Hierarchical Condition Category Model ("CMS-HCC" or "HCC"), uses demographic and diagnostic information from the current year to predict total payments for the following year. 42 C.F.R. §422.308(c),(e).  As described in greater detail below, to the extent an MAO can demonstrate that it is insuring a

patient pool that has a relatively higher risk profile, it can seek and secure relatively higher capitation payments from Medicare.

42.    The separate HCC disease categories assigned to an MAO's members based on medical encounters during the twelve-month period preceding the payment year ultimately dictate the amount of the monthly capitation payments that CMS pays to that MAO during the payment year. This prospective payment system is known as "health status based risk adjustment," or, in its abbreviated form, "risk adjustment."

43.    The CMS-HCC Model is designed to help MAOs manage their risk. It accomplishes this by increasing capitation payments to MAOs for plan members who are being treated for diseases that typically require relatively higher cost outlays. The capitation rate for each member of an MAO is adjusted using a formula that multiplies the MAO's base capitation rate by that member's risk adjusted multiplier. Thus, the more serious the conditions that afflict an MAO plan's members during the reporting year, the higher the aggregate monthly capitation payment the MAO will receive from CMS in the succeeding payment year.

44.    Payments under the CMS-HCC Model are designed to match the health risk profiles of an MAO's members with the capitation payments that CMS pays to the MAO. Thus, an MAO whose members have higher risk profiles (*i.e.*, members with relatively more severe diagnoses) will receive higher monthly payments from CMS.

### C.    CMS Requirements for the Submission of Risk Adjustment Data:

45.    As part of the CMS-HCC program, MAOs are required to submit data reports to CMS: "Each MA organization must submit to CMS (in accordance with CMS instructions) the data necessary to characterize the context and purposes of each item and service provided to a Medicare enrollee by a provider, supplier, physician, or other practitioner." 42 C.F.R.

§ 422.310(b). The data reports that MAOs submit to CMS reflect the diagnosis codes that the MAOs assign to each member of their respective enrolled populations. CMS uses these data reports to "risk adjust" capitation rates to be paid to each MAO. In other words, the data reports that CMS receives from an MAO during the latter's reporting year determine the capitation payments that MAO will receive from Medicare in the succeeding payment year.

46.    The risk adjustment data submitted by MAOs must "conform to the requirements for equivalent data for Medicare fee-for-service when appropriate, and to all relevant national standards." 42 C.F.R. § 422.310(d).

47.    Medicare regulations impose a duty on MAOs and the MAOs' contractors to, at a minimum, "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse." 42 C.F.R. § 422.503(b)(4)(vi).

48.    Under applicable Medicare regulations, the diagnosis codes that MAOs submit to CMS must be supported by properly documented medical records. CMS requires that all diagnostic information (and the codes derived therefrom) must be obtained through a face-to-face encounter between the patient and a physician. The treating physician must document the facts supporting the diagnosis in the patient's medical record and must sign and date the record. 42 C.F.R. §§ 422.310; 422.311.

49.    Significantly, to qualify for inclusion in the risk-adjustment process, a "medical record" reflecting a plan participant's face-to-face encounter with a provider must be created within a defined twelve-month period.  The data collected during that twelve-month reporting

period determines the capitation payments made during a subsequent 12-month payment period. 42 C.F.R. § 422.310(g).

50. For data validation purposes, CMS relies on an MAO's "one best medical record" created during the reporting period for each plan participant:

> The one best medical record for the purposes of Medicare Advantage Risk Adjustment Validation (RADV) means the **clinical documentation for a single encounter for care (that is, a physician office visit, an inpatient hospital stay, or an outpatient hospital visit)** that occurred for one patient during the data collection period. The **single encounter for care must be based on a face-to-face encounter with a provider deemed acceptable for risk adjustment and documentation of this encounter must be reflected in the medical record**.

42 C.F.R. § 422.2. (Emphasis supplied). For purposes of the medical record review appeal process, no other documentation beyond the one best medical record and any related attestation will be considered. 42 C.F.R. § 422.311.

51. According to section 7.1.5 RADV of the 2008 CMS Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide, all diagnoses submitted for payment (*e.g.,* used for Hierarchical Condition Categories ["HCCs"]) must be:

(i) Documented in a medical record that was based on a face-to-face **health service encounter** between a patient and a healthcare provider;

(ii) Coded in accordance with the ICD-9-CM Guidelines for Coding and Reporting;

(iii) Assigned based on dates of service within the data collection period; and

(iv) Assigned by an acceptable RA provider type and RA physician specialty.

(Emphasis supplied).

52. Accurate codes must be assigned to the reported diagnoses in accordance with the International Classification of Diseases, 9th Edition, Clinical Modification (ICID-9-CM) Guidelines for Coding and Reporting.

53.     The CMS-HCC system utilizes the ICD-9 diagnostic information received from MAOs as the primary indicator of each member's health status.

54.     CMS groups the ICD-9-CM codes it receives from each MAO into separate disease categories known as HCCs.  HCC categories are assigned on the basis of the type of disease diagnosed and the costs of treating that disease.

55.     CMS relies upon the MAOs to assign correct ICD-9-CM codes so that it can place each MAO member in his/her correct HCC category and properly risk-adjust capitation rates to ensure that MAOs are being compensated only for the services they actually provide.

56.     Not all ICD-9-CM codes are included in the CMS payment model. In other words, not all diagnoses affect capitation payments. Risk-adjusted capitation payments are adjusted higher only if the MAO can demonstrate through a *bona fide* medical record that its enrollees were diagnosed with major medical conditions such as diabetes, cancer, heart disease, etc. during the reporting period. Accordingly, the MAOs have a powerful financial incentive to reflect the most serious medical conditions in their data submissions to CMS.

57.     If an MAO assigns unsupported or improperly supported ICD-9-CM codes to an MAO plan member for any of these major medical conditions, it will improperly skew the risk-adjusted capitation payment that MAO receives from Medicare throughout the succeeding payment year.

58.     After CMS receives a data submission from an MAO, it evaluates that MAO members' demographic characteristics, diagnoses, and treatments in inpatient, outpatient and physician settings. Generally, an MAO participant diagnosed with more illnesses is deemed to receive more services from his/her MAO, thereby entitling the latter to a higher capitation payment for that participant.

59.    CMS provides MAOs with a one-time per calendar year opportunity to reconcile risk adjusted capitation payments. It allows the MAO a period of approximately twelve (12) months after the initial data submission deadline to submit additional or corrected ICD-9-CM codes.

60.    MAOs have a statutory obligation to request and return any overpayment received from the Government.  42 U.S.C. § 1320a-7k(d).  Any overpayment retained after the statutory deadline is an "obligation" for purposes of 31 U.S.C. § 3729. 42 U.S.C. § 1320a-7k(d)(4)(B).

**D.    Censeo's "Advanced Evaluation" Process:**

61.    On or before 2011, Dambro, in his capacity as Chief Medical Officer of Censeo, concocted a scheme designed to maximize the risk scores and, hence, the capitated payments paid to the Censeo MAOs by the Medicare program. Instead of relying upon medical records provided by physicians actually engaged in the treatment of Censeo MAO members, Censeo would contract with Censeo MAOs to (i) utilize an algorithm to identify the members of each client Censeo MAO it suspected might be suffering from the medical conditions most likely to increase risk-adjusted capitation payments; and (ii) have physicians conduct what it referred to as "in home assessments" of these members in an effort to create what all Defendants purported to be "medical records" of these individuals within the requisite reporting period.  These home visits would be utilized to collect data that the Censeo MAOs (or Censeo acting on their behalf) would directly submit  to CMS to support their alleged entitlement to relatively higher capitation payments in the subsequent payment period.

62.    When Censeo enters into contracts with each Censeo MAO to perform "in-home assessments" of that Censeo MAO's members, it is understood by both the Censeo MAO and Censeo that the assessments are not for purposes of care or treatment. As explained in Censeo's

marketing materials, Censeo targets plan participants suspected of having only the most serious

health issues – those with chronic needs or conditions – thereby ensuring "that the Censeo

physician resources will be productively applied with positive results:"

> [A]lgorithms focused on risk adjustment evaluate each member's demographic characteristics, medical claims and pharmacy data to identify a list of members whose care needs may not have been adequately identified or addressed. Censeo's clinical staff conducts a quality review of the list to ensure that members have been properly selected. *This review ensures that the project will avoid expending resources on members with no chronic needs or conditions. It ensures that the Censeo physician resources will be productively applied with positive results.*

(Emphasis supplied). The "positive results" referenced in the above-quoted marketing materials

are the enhanced capitation payments that the Censeo MAOs can expect to receive from CMS. In

other words, Censeo targets members of the Censeo MAOs whom its algorithm suggests are

most likely to yield the most serious diagnoses – those that are more likely to generate higher

capitation payments for Censeo's MAO clients.

63.     Before performing an "in-home assessment" of a Censeo MAO member, the

physician retained by Censeo to perform such "in-home assessment" receives information from

the Censeo MAO describing such member's demographic information, current conditions and

diagnoses, the medications prescribed for such member, the medical procedures such member

has experienced and other historical data relating to the member.

64.     Using the clinical history provided by the Censeo MAO for the MAO member,

the Censeo physician completes the "in-home assessment" by asking the member a series of

questions to confirm his/her condition, treatment and medications. Other than taking the

member's vital signs and weight, listening to the member's heart and lungs, and checking the

member's reflexes, no physical exam is performed as part of the Censeo in-home assessment. No

lab tests are performed. A "Q&A" for MAO members on the Censeo website describes the process as follows:

**What will happen during the visit?**

The visiting provider will review your medical history, any current treatments, and medications you may be taking. There will also be a brief physical exam performed which includes your blood pressure and pulse being taken. There will not be any invasive procedures performed.

65. The physicians retained by Censeo to conduct "in-home assessments" of previously-identified members of the Censeo MAOs collect "data" on a check-the-box "evaluation form." The physician fills out the boxes on the "evaluation form" by asking the MAO member a series of questions about his/her medical history and prescribed medications. Virtually all of the conditions reflected on the evaluation form are derived from the conversation that the Censeo-retained physician conducts with the MAO member. In other words, the conditions reflected on the evaluation forms are not medical diagnoses derived from a medical examination, but, instead, are self-reported conditions captured from the medical history, and verbally confirmed by the MAO member during the course of his/her conversation with the Censeo-retained physician. A self-reported condition is not the equivalent of a medical diagnosis.

66. At the conclusion of the assessment, the member signs the assessment form, confirming the member's understanding that the Censeo-retained physician is not assuming responsibility for the member's care.

67. No treatment plans were prescribed by Censeo's physicians for members of Censeo MAOs that Censeo's physicians evaluated. Instead, the standard form provided by Censeo contains a short "check-the-box" list of "recommendations" that the Censeo-retained physicians were supposed to leave with members who were subjected to its home assessments. Virtually all of the recommendations on the checklist are applicable to everyone, and are topics

-17-

that any primary care physician would always discuss with a patient irrespective of that patient's physical condition. In other words, there is no "treatment plan" or "care plan" specifically designed for each MAO member that is the subject of an in-home assessment. Because the "check-the-box" generic form is of no value to any person subjected to a home assessment, on numerous occasions the physicians performing the in-home assessment did not leave the form with the member, but, instead, returned it to Censeo. The "check-the-box" generic "recommendation" form was provided for the sole purpose of allowing Censeo to claim that its physicians were encouraging follow-up care, when, in fact, Censeo's sole objective was to cause additional codes for serious illnesses to be collected in a purported "medical record" for submission to CMS through the Risk Adjustment Processing System ("RAPS").

68.     In many, if not most, instances, primary care physicians who were actually treating and caring for Censeo MAO members were not provided with the results of the in-home assessments conducted by the Censeo-retained physicians. In fact, Ramsey knows that several primary care physicians contacted Censeo inquiring as to why their patients were seen by Censeo's physicians.

69.     Further, even in instances where the primary care physicians were actually sent the results, the in-home assessments provided nothing in the way of clinical information that might assist a primary care physician in treating a patient. The primary care physicians were already aware of the member's general health history and prescribed medications; accordingly, the report from Censeo did not tell them anything they did not already know. In short, if the information was sent to a primary care physician at all, it was only so that Censeo and the other Defendants could pretend that the in-home assessments would encourage follow-up care or

treatment, when, in fact, all Defendants knew that they were simply used as part of a code collecting scheme.

70.     In February 2013, CMS issued Advance Notice of Methodological Changes for Calendar Year (CY) 2014 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies and 2014 Call Letter ("2014 Call Letter").  CMS' 2014 Call Letter expressed concern "that these risk assessments could be used as a vehicle for collecting risk adjustment diagnoses without follow-up care or treatment being provided to the beneficiary by the plan. The purpose of risk adjustment is to measure health status that is related to plan liability and in the case of these assessments, it is not clear that there is plan liability associated with the provision of treatment."   In other words, the home assessments themselves were not a "health service encounter" or "encounter for care," and they were picking up diagnoses that bore little relationship to the actual liability that the Censeo MAOs might incur.

71.     In an apparent response to CMS' 2014 Call Letter, Censeo issued a press release in March of 2013 announcing that it was changing the name of its in-home assessment process. Instead of calling it "Advanced Evaluation," Censeo now termed the process "Care Consult." The press release falsely stated that "[d]uring the 45-60 minute consultation, one of Censeo Health's 10,000 licensed physicians will review the member's medical history and medications; conduct simple lab tests; identify gaps in care and health risks; and answer questions." In fact, no lab tests are ever performed. The assessment of "health risks" is limited to noting high risk medications and fall risks.  In short, the Censeo-retained physicians are not doing anything more during "in-home assessments" conducted under Censeo's "Care Consult" program than they had done prior to March of 2013.  As before, Censeo's evaluation form is primarily used as a tool to

pick up diagnostic codes that the Censeo MAOs submit to CMS for the purpose of claiming higher monthly capitation payments.

**E.  Censeo's Evaluation Process Yields "Terrific Sales":**

72.  In the past eighteen (18) months, the number of in-home assessments completed by Censeo has risen dramatically. On May 1, 2013, Censeo announced that the Company would complete twice as many assessments in 2013 as it completed in 2012. In fact, Censeo announced that its "clients propelled the Company into a record-setting first quarter, increasing the number of evaluations completed year over year by 250 percent." As a result, the diagnosis codes submitted to CMS by Censeo number in the millions, and its clients include several of the largest MAOs in the United States.

73.  Censeo has contracted with at least thirty (30) MAOs to provide these "home assessments." Among the thirty are the Censeo MAOs named in this Complaint and the John Does who have yet to be identified.

74.  With Censeo MAOs realizing enormous financial benefits associated with Censeo's "in-home assessments," Censeo has grown rapidly. Censeo's May 1, 2013 announcement stated that "revenue growth . . . is projected to reach $120 million in 2013, 140 percent year-over-year increase from 2012."

**F.  Ramsey Joins the Company as Censeo Begins Hiring Coders:**

75.  At the end of the first quarter of 2013, Censeo employed less than ten (10) coders. Seeing an opportunity to generate additional revenue (and to conduct as much of the Medicare coding in-house as possible), Censeo began hiring its own coders in the second quarter of 2013. Prior to this time, Censeo had contracted out the entire coding function to third-party

vendors, including Defendant Altegra. Currently, Censeo conducts some of the coding in-house and subcontracts some of the coding out to other entities, including Altegra.

76. The third-party vendors with whom Censeo contracted to provide coding services, including Altegra, are required to follow Censeo's Coding Manual and Censeo's instructions as to how coding is to be done.

77. In late March of 2013, Ramsey, a Certified Professional Coder ("CPC") with over fifteen (15) years of experience in coding, was hired by Censeo as a "lead" coder. Ramsey reported to Ridlehuber, Censeo's Director of Quality, who also was a CPC.

**G.     The Creation of the False or Fraudulent Claims:**

78. At the time Ramsey was employed, Censeo did not require the "doctors" it engaged to conduct in-home assessments to produce evidence of their academic credentials and license to practice medicine. Censeo subsequently determined that certain of the purported "doctors" it employed to conduct these in-home assessments were not licensed to practice medicine. On information and belief, none of the Defendants ever informed CMS that some of the diagnosis codes that had been submitted on behalf of the Censeo MAOs were based on assessments performed by unlicensed individuals.

79. In many instances, Censeo assigned its retained doctors to conduct as many as ten (10) in-home assessments in geographically dispersed areas on the same day. Censeo paid the doctors a flat fee of only $100 per assessment. Furthermore, in the vast majority of cases, Censeo did not reimburse doctors for gas or mileage to reach the homes of those members they were scheduled to examine. Given these factors, the Censeo-retained doctors had a financial incentive to complete each assessment in as little time as possible.

80. At some point after 2011, Censeo obtained actual knowledge that some of the doctors who had allegedly performed "face-to-face" in-home assessments had not, in fact, conducted assessments of the designated Censeo MAO members at all. While these doctors created what purported to be "medical records" documenting "face-to-face" medical assessments of the Censeo MAO members, the fact that they were not conducting assessments at all was detected when they submitted identical data for each member they supposedly examined on the same day.

81. For example, to determine whether an examined Censeo MAO member was suffering from some form of dementia, including Alzheimer's disease, the assessment form contained a test to evaluate the member's orientation as to time. This was accomplished by having the Censeo-retained doctor ask the examined member to draw hands on a clock inside a circle on the assessment form reflecting a specified time of day. In some cases, it was obvious that the same person had drawn the clock on multiple forms. In fact, the hands on the clocks would sometimes reflect the same error. For example, if the instruction was to draw a clock reflecting 10:15, Censeo might receive back multiple evaluation forms completed by the same doctor and all reflecting 10:20.

82. The fact that certain of the Censeo-retained doctors were not conducting assessments at all was further confirmed when assessment forms were received by Censeo for Censeo MAO members that had previously cancelled their scheduled in-home visits.

83. Even after these doctors had been caught fabricating records, Censeo did not terminate or discipline them. Instead, it continued to schedule them to perform "in-home assessments."

84.     On information and belief, neither Censeo nor any of the other Defendants ever informed CMS that certain of Censeo's doctors were fabricating "in-home assessments" and never informed CMS that the coding derived from those fabricated assessments resulted in overpayments being made to the Censeo MAOs.

85.     Censeo asked its doctors, many of whom were radiologists, to record conditions that favorably affected the capitation payments CMS paid to the Censeo MAOs even though the conditions in question could not reliably be diagnosed during an in-home assessment. For example, a fundoscopy exam performed without dilation cannot be relied upon to diagnose diabetic retinopathy or diabetes with ophthalmic manifestations. Likewise, monofilament testing alone is not recommended for diagnosing peripheral vascular disease. Similarly, without lab results, it is not possible to diagnose uncontrolled diabetes or microalbuminuria. Finally, without a CT scan or an MRI, it is impossible to diagnose spinal stenosis.

86.     When several physicians objected to making such diagnoses solely on the basis of the in-home assessments, Censeo insisted that they continue to make such diagnoses. For example, Censeo employees charged with responsibility for quality assurance told the doctors performing the "in-home assessments" that they were not to vary from the protocol established by Defendant Dambro. Thus, when doctors protested that it was medically impossible to make a diagnosis of diabetic retinopathy based on a fundoscopy performed without dilation, they were nevertheless told to note the diagnosis on the assessment form.  The vast majority of the doctors did what they were told.  The few who protested and adhered to their principles would make excuses as to why the fundoscopy could not be performed (e.g. the lighting was insufficient).

87.     Once an assessment form is completed and signed by the member and the Censeo-retained physician, it is uploaded for coding. As described in greater detail below, coding

is carried out both in-house by Censeo-employed coders and by coders employed by third-party entities under contract to perform coding work for Censeo, including Defendant Altegra.

88.   Censeo's coding practices violated the requirement that "[d]iagnoses must be supported by appropriate medical record documentation." CMS 2013 National Technical Assistance Risk Adjustment 101 Participant Guide, Section 3.2.4. Specifically, alternative data sources, such as prescriptions, cannot be used as substitutes for a physician's actual diagnosis of a condition:

> The MA organization may not, however, use ADS [Alternative Data Sources] as substitutes for documenting diagnoses from a hospital/physician. As in all diagnoses submitted, there must be medical record documentation to support the diagnosis as having been documented as a result of a hospital inpatient stay, a hospital outpatient visit, or a physician face-to-face visit during the data collection period. For example, a prescription for an ACE inhibitor, alone, is not considered sufficient for the sole data source of 'clinical evidence' of congestive heart failure (CHF); instead, the medical record needs to document an appropriate clinician's diagnosis of CHF during the data collection period (e.g., where an 'appropriate clinician' is a physician/nurse practitioner/physician assistant.").

2008 CMS Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide, § 3.2.4.

89.   In direct violation of the requirement that all diagnoses must be supported by appropriate medical record documentation, Censeo's and Altegra's coders were directed and instructed to "pick up" and code from diagnoses predicated solely on the medications currently being used by the member. This was done even if the code was not supported by a diagnosis set out in the doctor's written report following the latter's face-to-face evaluation of the member.

90.   Consistent with the Censeo assessment form and Coding Manual, the coders employed by Censeo and Altegra understood that it was company policy that if a prescribed medication could potentially support a diagnosis, they were to code for that diagnosis.

-24-

91.     The Censeo home assessment form identified several medications that were "supportive" of diagnoses, including chronic kidney disease, congestive heart failure, and chronic obstructive pulmonary disease. In addition, the Censeo assessment form collected information regarding medications being taken for sleep, prostate cancer, breast cancer prevention, and chronic hepatitis.

92.     Rheumatoid arthritis was coded whenever certain nonsteroidal anti-inflammatory drugs ("NSAIDs") had been prescribed. In reality, NSAIDs are not limited to the treatment of rheumatoid arthritis, but, in fact, are some of the most commonly prescribed general pain medications for adults.

93.     Similarly, cystic fibrosis was picked up as a code if medications being taken by the member were commonly associated with a diagnosis of cystic fibrosis – even in instances where the age of the MAO member made it virtually impossible that he/she was suffering from cystic fibrosis. Epileptic seizures were also coded based solely on the medications prescribed.

94.     Coders employed by Censeo and Altegra were also instructed that they were to code for certain diagnoses orally reported by a Censeo MAO's member irrespective of whether that member had actually been treated for that condition during the relevant year. For example, Ramsey became aware that a diagnosis of myocardial infarction would be picked up as a code based solely on the oral report of a Censeo MAO's member that he/she had experienced one or more symptoms of myocardial infarction, even though the member in question had not been treated for that condition within the applicable reporting period.

95.     With a handful of exceptions, the coders hired by Censeo were "apprentice" coders who had passed the coding exam and earned their certification, but who had not worked in Medicare coding for the two years required to be classified as Certified Professional Coders

without the "apprentice" qualification.  When Ramsey questioned the practice of hiring only apprentice coders, she was told by Ridlehuber that Censeo preferred to hire apprentice coders because they did not have "bad habits." Ramsey now believes that Censeo hired mostly apprentice coders because the apprentice coders either lacked the experience required to question Censeo's coding practices, or needed the job to satisfy the two-year prerequisite necessary to qualify as a Certified Professional Coder without the apprentice qualification, and, therefore, would not question Censeo's coding practices.

96.     Censeo had only two full-time employees whose function was to "audit" the work performed by Censeo's coders, including the work performed by coders working for Censeo at Altegra and other outside coding firms.  One of these "auditors" was a gentleman who had failed the coding exam on two occasions and was not a certified coder.  Ridlehuber confided in Ramsey that she believed that the other "auditor" had no idea what she was doing, and even questioned how she had passed the Certified Professional Coder exam. Thus, Censeo and the Censeo MAOs were not in compliance with Medicare regulations requiring that they "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse." 42 C.F.R. § 422.503(b)(4)(vi).

**H.     Censeo's  Practices  Resulted  in  the  Submission  of  Diagnoses  Codes  That Artificially Inflated Risk Scores:**

97.     After coding, Censeo converts the uploaded codes to RAPS for submission to CMS.  Censeo and the other Defendants knowingly created and submitted Medicare diagnoses codes to CMS based on the "in-home assessments," fully aware that such codes did not comply with Medicare regulations, even though such compliance and certification of such compliance

were express prerequisites to the Censeo MAOs receiving capitation payments from the Government.

98.     The records that Censeo created were material to a false or fraudulent claim in that they were utilized to improperly increase the number of reported diagnoses that the Censeo MAOs submitted to CMS, thereby artificially inflating the respective risk scores assigned to the members of the Censeo MAOs which, in turn, improperly increased the capitation payments that CMS made to the latter in the succeeding payment year.

99.     As intended, the diagnoses codes submitted to CMS by Censeo and the other Defendants on behalf of the Defendant Censeo MAOs, including Does 1-10, were used to develop risk scores that were used to adjust the capitated payment rates paid by Medicare to the Censeo MAOs.

**I.      Based Upon Requests Including False Certifications of the Accuracy of the Risk Adjustment Data, the Censeo MAOs Obtain Overpayments:**

100.     As described in paragraphs 38 and 39 above, Medicare regulations and the mandatory provisions of the Medicare Advantage Organization Contract Form require that the Censeo MAOs make monthly claims or requests for capitation payments as to each beneficiary validly enrolled. The contract states that "[a]s a condition for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G, the MA Organization agrees that its chief executive officer (CEO) . . . must request payment under the contract on the forms attached hereto . . . ."

101.     As a condition to their receipt of monthly capitation payments, each of the Censeo MAOs and Censeo were required to have their respective authorized officers or designated representatives make monthly certifications, based on best knowledge, information, and belief,

that the risk adjustment data submitted to CMS on behalf of the Censeo MAO was accurate, complete, and truthful. 42 C.F.R. § 422.504. A form of the required attestation is copied below:

> ATTESTATION OF RISK ADJUSTMENT DATA INFORMATION RELATING TO CMS PAYMENT TO A MEDICARE ADVANTAGE ORGANIZATION
>
> Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services (CMS) and (INSERT NAME OF MA ORGANIZATION), hereafter referred to as the MA Organization, governing the operation of the following Medicare Advantage plans (INSERT PLAN IDENTIFICATION NUMBERS HERE), the MA Organization hereby requests payment under the contract, and in doing so, makes the following attestation concerning CMS payments to the MA Organization. The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization or additional benefit obligations of the MA Organization and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution.
>
> The MA Organization has reported to CMS during the period of (INDICATE DATES) all (INDICATE TYPE - DIAGNOSIS/ENCOUNTER) risk adjustment data available to the MA Organization with respect to the above-stated MA plans. Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.

102.    As a result of the acts and concealments of Censeo, the Censeo MAOs and the other Defendants, artificially high risk scores were assigned to the participants in the plans sponsored by such Censeo MAOs, and the capitated payments received by the Censeo MAOs in the succeeding payment year were inflated. Through higher capitation rates based on a population of patients with more severe illnesses than supported by the *bona fide* medical records prepared by the patients' treating physicians, the assessments performed and diagnoses codes submitted by Censeo resulted in the Government's making substantial overpayments to each of the Censeo MAOs.

103.    Neither Censeo nor any of the Censeo MAOs have reported or returned such overpayments to the Government.

-28-

### J.  **Ramsey is Terminated:**

104.    On July 11, 2013, Ramsey was promoted to Coding Manager and received a raise of $10,000.00.

105.    Two weeks after Ramsey was promoted, Commonwealth, one of the Censeo MAOs, expressed concern that Censeo's home assessments would not pass a CMS audit. Among other things, Commonwealth observed that there was very minimal, if any, meaningful documentation as to how a reported condition was monitored, evaluated, assessed/addressed or treated.

106.    Commonwealth was not the first to question the integrity of Censeo's in-home assessment program.  Prior to receiving the comments from Commonwealth, Ramsey and certain of Censeo's coders and auditors questioned the wording on Censeo's evaluation form, suggesting that the wording could lead a doctor retained by Censeo to choose diagnoses for conditions the patient did not have. When Censeo's in-house auditors attempted to raise these issues directly with Dambro, Ridlehuber called them into her office and told them that Dambro was furious over the incursion, and instructed them that they were never again to approach Dambro directly to voice their questions or concerns.

107.    After that incident, Ramsey and Censeo's in-house auditors understood that Censeo was interested only in increasing the number of diagnoses coded and reported to CMS on behalf of each Censeo MAOs, thereby artificially inflating risk scores and reimbursement rates for the Censeo MAOs, all in direct violation of Medicare regulations.

108.    As part of her responsibilities as Coding Manager, Ramsey had direct supervisory responsibility for Censeo's coders and interfaced directly with them on a daily basis.  In her daily interface with Censeo's coders, the vast majority of whom were apprentices, Ramsey, who had

more years of coding experience than any other Censeo employee, advised Censeo's coders that she would not report diagnoses codes that could not be supported due to lack of lab results and/or clinical evidence. She specifically advised coders that she would not code a chronic condition like uncontrolled diabetes based on the medications that an examined participant was reported to be using. That advice was inconsistent with the coding policy expressed by Defendant Ridlehuber and incorporated into the Censeo Coding Manual.

109.    On August 8, 2013, and for the first time since Ramsey had been promoted, Ridlehuber met directly with Censeo's coders. Specifically, Ridlehuber hosted a "Coding Lunch and Learn" class with Censeo's coders. During that meeting, codes were discussed that Ramsey had advised coders to stay away from due to lack of lab results and/or clinical evidence to support the diagnoses. Censeo then learned that its compliance with Medicare regulations was being questioned by Ramsey, a Certified Professional Coder with over fifteen (15) years of coding experience, and that Ramsey was advising coders under her supervision that she would code only those diagnoses that could legitimately be supported by a doctor's assessment.

110.    The following day – August 9, 2013 – Censeo terminated Ramsey.

111.    When Ramsey inquired as to why she was being terminated, Greve, Censeo's Chief Compliance Officer, told her that "we can no longer trust you." While Greve did not elaborate on that statement, Ramsey understood that Greve was referring to the fact that she could not be trusted to carry out Censeo's coding practices, and to keep quiet about other fraudulent conduct by Censeo. Among other things, Censeo executives, including Ridlehuber and Greve, had confided in Ramsey that Censeo employees acting under the direction of Kari Dennis ("Dennis") had added physician initials that were missing from patient records and had altered patient records to support higher HCC codes. Dennis was not terminated for such

misconduct, but, instead, was assigned a new role as Censeo's Director of Operations - Client Services.

## COUNT I

## (AGAINST ALL DEFENDANTS FOR VIOLATING 31 U.S.C. § 3729(a)(1)(A), (B) and (G))

[False Diagnosis Reporting]

112.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1-111 above as if set forth in their entirety at this point in the Complaint.

113.    Under applicable Medicare regulations, MAOs can only submit diagnosis codes to the Government that are supported by medical records prepared by a physician during a face-to-face "health service encounter" or "encounter for care."

114.    Censeo was retained by the Censeo MAOs to target their members who were suspected of having chronic needs or conditions. As confirmed by the assessment forms signed by the members of those Censeo MAOs, the assessments were not performed for purposes of care or treatment. Instead, the assessment forms were used to increase the number of diagnoses during a qualifying period, thereby increasing the respective risk scores of the Censeo MAOs (including Does 1-10), in order to increase the capitation payments they received from the Government.

115.    The submission of diagnosis codes based on the in-home assessments performed by Censeo resulted in submission of diagnosis codes to the Government that were not supported supported by medical records prepared by a physician during a face-to-face "health service encounter" or "encounter for care," all as required by the applicable Medicare regulations.

116.    In fact, there was little, if any, utility to the home assessment "exams" conducted by Censeo's physicians. The entire "home assessment" exercise was carried out solely to secure

self-reported information that Censeo's physicians would use to check off diagnoses on the evaluation forms so that the examinees' MAOs could claim higher capitation payments from CMS.

117.   The "physical exams" performed during these home assessments, if they can be called that, were only of the most cursory nature. The bulk of the home examination process consisted of recording checks on the assessment form based on the oral statements of the targeted members and the physicians' merely looking at the medications that the patient was taking.

118.   The Censeo MAOs, Censeo and the other Defendants knowingly submitted false or fraudulent claims to CMS based on the evaluation forms and improper coding records created by Censeo and/or one of Censeo's third-party vendors, including Altegra. The Defendants either knew that the records prepared by Censeo and submitted to CMS were false, acted in deliberate ignorance of the truth or falsity of such records and coding documentation or acted in reckless disregard of the truth or falsity of such records.

119.   As a consequence of the foregoing, millions of diagnosis codes were submitted to CMS by Censeo on behalf of the Censeo MAOs, or directly by the Censeo MAOs themselves, that were not supported by properly documented medical records.  In spite of their knowledge that the in-home assessments were not performed for purposes of care or treatment, and that the diagnosis codes did not comply with Medicare regulations, neither Censeo, the Censeo MAOs it contracted with, nor any of the other Defendants took any action to (a) ensure that only diagnosis codes supported by properly documented medical records (i.e., medical records prepared by a physician during a face-to-face "health service encounter" or "encounter for care) were

submitted for purposes of risk adjustment, or (b) withdraw the diagnosis codes that they knew or should have known were not supported by any properly documented medical records.

120. As a result of the improper submission of diagnosis codes to the Government since 2011 and continuing to the present day based on "in-home assessments" performed by Censeo, the Government was induced to and did pay capitation rates to the Censeo MAOs that were inflated.

121. As part of the monthly claims or requests for capitation payments submitted by the Censeo MAOs, an authorized officer or representative of Censeo (and/or an authorized officer or representative of a Censeo MAO who directly reported such Censeo MAO's data to CMS) submitted to the Government an attestation certifying that Censeo (and/or such directly reporting Censeo MAO) truthfully submitted all required information to the Government, and had complied with all applicable laws and Medicare regulations.

122. At all times relevant hereto, Defendant Censeo and its officers, employees and agents (including Defendants Dambro, Greve and Ridlehuber), Defendant Altegra, and all the Defendant Censeo MAOs routinely and repeatedly violated 31 U.S.C. § 3729(a)(l)(A) by knowingly presenting, and/or causing to be presented to agents, contractors or employees of the Government, false or fraudulent claims for payment and approval by Medicare for the period 2011 and thereafter.

123. At all times relevant hereto, Defendant Censeo and its officers, employees and agents (including Defendants Dambro, Greve and Ridlehuber), Defendant Altegra, and all the Defendant Censeo MAOs routinely and repeatedly violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, and/or causing to be made or used, false records or statements that

were material to false or fraudulent claims presented to the Government and approved and paid by the Government for the period 2011 and thereafter.

124. At all times relevant hereto, Defendant Censeo and its officers, employees and agents (including Defendants Dambro, Greve and Ridlehuber), Defendant Altegra, and the Defendant Censeo MAOs routinely and repeatedly violated 31 U.S.C § 3729(a)(1)(G) by improperly concealing overpayments that the Defendant Censeo MAOs received from the Government for the period 2011 and thereafter.

125. At all times relevant hereto, Defendant Censeo and its officers, employees and agents (including Defendants Dambro, Greve and Ridlehuber), Defendant Altegra, and the Defendant Censeo MAOs, routinely and repeatedly violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using and/or causing to be made or used, false records and statements to conceal, avoid, or decrease the obligation to return to the Medicare programs the overpayments that the Defendant Censeo MAOs had received from the Government for the period 2011 and thereafter.

126. As a result of its conduct, each Defendant is liable to the Government for (i) three times the amount of damages sustained by the Government as a result of the false or fraudulent claims submitted by or on behalf of that Defendant to the Government (including any damages resulting from its retention of an overpayment); and (ii) a civil penalty equal to between $5,000 and $10,000 per violation. 31 U.S.C. § 3729.

127. As a private litigant pursuing a *qui tam* case, Relator is entitled to recover a percentage of the full amount of any recovery, attorneys' fees, costs and expenses (such attorneys' fees, costs and expenses to be awarded against the Defendants) pursuant to 31 U.S.C. § 3730(d).

## COUNT II

## (AGAINST ALL DEFENDANTS FOR VIOLATING 31 U.S.C. § 3729(a)(1)(A), (B) and (G))

## [Up-Coding]

128.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1-127 above as if set forth in their entirety at this point in the Complaint.

129.    Under applicable Medicare regulations, MAOs can only submit diagnosis codes to the Government that are supported by medical records prepared by a physician during a face-to-face "health service encounter" or "encounter for care."

130.    Censeo was retained to perform in-home assessments of targeted Censeo MAO members identified as having chronic needs or conditions. Using its own algorithm, Censeo would select specific members of the Censeo MAOs – those who offered the promise of generating more serious codes – to receive home assessment visits from Censeo-retained physicians. Relatively more healthy members of the same Censeo MAOs were not selected to receive home assessments.

131.    As confirmed by the signatures of the MAO members who were subjected to these home assessments, the assessments were not performed for purposes of care or treatment. Instead, the home assessment forms were improperly characterized as "medical records" to justify reporting to CMS an increased number of serious diagnoses attributable to a Censeo MAO's members. These home assessments were knowingly utilized by the Defendants to increase the respective risk scores that CMS assigned to the Censeo MAOs, thereby falsely and fraudulently increasing the capitated payments paid by the Government.

132.    The submission of diagnosis codes based on the in-home assessments performed by Censeo resulted in Defendants' knowingly submitting diagnosis codes to the Government that

were not supported by medical records prepared by a physician during a face-to-face "health service encounter" or "encounter for care," as required by the applicable Medicare regulations.

133. The procedures and methods developed and used by Censeo were biased in favor of "up coding" the members' diagnoses because diagnoses were coded not based on *bona fide* physical exams conducted by the Censeo-retained physicians, but on the basis of (i) alleged conditions that the examinees self-reported in oral statements during the course of interviews conducted by the Censeo-retained physicians, (ii) historical medical information that Censeo and the Censeo MAOs provided to the "in home assessment" physicians prior to the time the home visits occurred and (iii) the medications that the Censeo-retained physicians found in the members' homes.

134. In several instances, the medical diagnoses that the Censeo-retained physicians "picked up" and recorded on the evaluation forms on the basis of the examinees' oral reports and historical medical information were diagnoses that could only be made with the benefit of lab or other diagnostic tests that were never performed.

135. Censeo performed the in-home assessments and created the home assessment evaluations knowing that such assessments would be utilized to increase the number of serious diagnoses reported to CMS by or on behalf of the Censeo MAOs, thereby improperly and fraudulently enhancing the respective risk scores assigned to members of the Censeo MAOs and, thus, increasing the capitation payments paid to the MAOs by the Government.

136. Defendants knowingly submitted (or caused to be submitted) diagnoses codes to the Government, fully aware that the effect of such submissions would be to increase the number of diagnoses used to calculate the respective risk scores of the Censeo MAOs, thereby improperly inflating the capitation payments received by such MAOs.

137. The diagnosis codes generated by Censeo and submitted to the Government and third-party vendors that Censeo retained to perform coding, including Altegra, were used to develop risk scores that improperly resulted in the Censeo MAOs being compensated by the Government at higher capitation rates than warranted.

138. As a result of the acts and concealments of Defendant Censeo and its officers, employees and agents (including Defendants Dambro, Greve and Ridlehuber), Altegra, and the Censeo MAOs, including their knowing creation and submission of false or fraudulent diagnosis codes and false or fraudulent certifications concerning the accuracy, truth and completeness of the information that they were providing to the Government, the capitated payments paid by the Government to the respective Censeo MAOs were falsely or fraudulently inflated through the creation of artificially high risk scores.

139. At all times relevant hereto, Defendant Censeo, its officers, employees and agents (including Defendants Dambro, Greve and Ridlehuber), Defendant Altegra, and the Defendant Censeo MAOs routinely and repeatedly violated 31 U.S.C. § 3729(a)(l)(A) by knowingly presenting and/or causing to be presented to agents, contractors or employees of the Government false or fraudulent claims for payment and approval during and after 2011.

140. At all times relevant hereto, Defendant Censeo, its officers, employees and agents (including Defendants Dambro, Greve and Ridlehuber), Defendant Altegra, and the Defendant Censeo MAOs routinely and repeatedly violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, and/or causing to be made or used, false records and statements material to false or fraudulent claims tendered by or on behalf of the Censeo MAOs under their respective Medicare contracts with the Government.

141.    At all times relevant hereto, Defendant Censeo, its officers, employees and agents (including Defendants Dambro, Greve and Ridlehuber), Defendant Altegra, and the Defendant Censeo MAOs, routinely and repeatedly violated 31 U.S.C. § 3729(a)(1)(G) by knowingly and improperly creating and concealing false records or statements that were material to each Censeo MAO's obligation to transmit money (i.e., overpayments) to the Government.

142.    At all times relevant hereto, Defendant Censeo, its officers, employees and agents (including Defendants Dambro, Greve and Ridlehuber), Defendant Altegra, and the Defendant Censeo MAOs routinely and repeatedly violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, and/or causing to be made or used, false records and statements to conceal, avoid, or decrease the respective Censeo MAO's obligation to repay and return to the Medicare programs the inflated capitation payments the Censeo MAOs received during and after 2011.

143.    As a result of Defendants' knowing creation, concealment and use of false records and statements, including the certifications that were a condition precedent to a Censeo MAO's receiving monthly capitation payments, Medicare paid more to the Censeo MAOs than it would have if the Defendants had properly and truthfully reported only the diagnosis codes that were supported by medical records created in compliance with Medicare regulations.

144.    As a result of its conduct, each Defendant is liable to the Government for (i) three times the amount of damages sustained by the Government as a result of the false or fraudulent claims created and submitted by or on behalf of that Defendant to the Government (including any damages resulting from its retention of an overpayment); and (ii) a civil penalty equal to between $5,000 and $10,000 per violation. 31 U.S.C. § 3729.

145.    As a private litigant pursuing a *qui tam* case, Relator is entitled to recover a percentage of any the proceeds of any recovery by or on behalf of the United States (whether by

adjudication, settlement or otherwise) against Defendants (or any of them), attorneys' fees, costs and expenses (such attorneys' fees, costs and expenses to be awarded against the Defendants) pursuant to 31 U.S.C. § 3730(d).

## COUNT III

## (AGAINST ALL DEFENDANTS FOR VIOLATING 31 U.S.C. § 3729(a)(1)(C))

### [Conspiracy]

146.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1-145 above as if set forth in their entirety at this point in the Complaint.

147.    Beginning in 2011 and continuing thereafter, the Defendants, and each of them, violated 31 U.S.C. § 3729(a)(1)(C) by knowingly conspiring to violate various provisions of the False Claims Act.

148.    Defendants conspired to violate 31 U.S.C. § 3729(a)(1)(A) by, among other things, intentionally submitting false or fraudulent diagnosis codes to the Government to support monthly capitation payments made by the Government to the Censeo MAOs. The Defendants knowingly conspired to submit false or fraudulent claims to the Government predicated on diagnosis codes that (a) were not supported by medical records prepared by a physician during a face-to-face "health service encounter" or "encounter for care," as required by the applicable Medicare regulations, but, instead, were based on "in home assessments" that were initiated by Censeo and which were designed solely to create "medical records" to improperly submit diagnoses codes to CMS to support higher capitation payments and (b) were not derived from diagnostic information generated by *bona fide* physical examinations, but, instead, were improperly predicated on oral reports of targeted members of the Censeo MAOs, historical medical information of targeted members of Censeo MAOs that the Censeo MAOs themselves

supplied to Censeo and Censeo's physicians, and the Censeo physicians' review of the medications that targeted members had been prescribed.

149.    The Defendants knew that the procedures and methods developed and used by Censeo were biased in favor of "up coding." Censeo directed its physicians to reflect diagnoses on its "check-the-box" home assessment form even in instances where such diagnoses could not reliably be derived from the type of cursory exam performed during such in-home assessments, which assessments did not include lab or other diagnostic tests.

150.    As described above, the Defendants also violated 31 U.S.C. § 3729(a)(1)(C) by conspiring to violate 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records or statements material to a false or fraudulent claim. The "medical records" created by Censeo, and the diagnostic codes derived therefrom, were false. They were presented to the Government to support the Censeo MAOs' false or fraudulent claims for inflated capitation payments.

151.    In addition to the foregoing, the Defendants also violated 31 U.S.C. § 3729(a)(1)(C) by conspiring to violate 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be used or made, false records or statements material to obligations to pay or transmit monies to the Government, and by knowingly and improperly conspiring to avoid an obligation to repay the Government overpayments realized from the false or fraudulent claims submitted by or on behalf of the Censeo MAOs.

152.    In short, the Defendants conspired to commit multiple violations of 31 U.S.C. §§ 3729(a)(1)(A), (B) and (G).

153.    As a result of Defendants' concealments and use of false or fraudulent records and statements, Medicare paid more to the Censeo MAOs than it would have if Defendant

Censeo and its officers, employees and agents (including Defendants Dambro, Greve and Ridlehuber), Defendant Altegra and the Defendant Censeo MAOs had properly and truthfully reported only the diagnoses codes that were properly supported in accordance with applicable Medicare regulations.

154. As a result of such conduct, each conspiring Defendant is liable to the Government for (i) three times the amount of damages sustained by the Government as a result of Defendants' conspiracy to violate 31 U.S.C. § 3729; and (ii) a civil penalty equal to between $5,000 and $10,000 per violation. 31 U.S.C. § 3729.

155. As a private litigant pursuing a *qui tam* case, Relator is entitled to recover a percentage of the proceeds of any recovery against Defendants by or on behalf of the United States (whether by judgment, settlement or otherwise), together with her attorney's fees, costs and expenses (such attorneys' fees, costs and expenses to be awarded against the Defendants) pursuant to 31 U.S.C. § 3730(d).

## DEMAND FOR A JURY TRIAL

Ramsey demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Qui Tam Relator Becky Ramsey-Ledesma, acting on behalf of the United States, prays for judgment in favor of the United States and against Defendants as follows:

1.  Treble the Government's damages according to proof;

2.  Statutory penalties according to proof;

3.  A relator's award of up to 30% of the amounts recovered by or on behalf of the Government;

4.      Attorneys' fees, expenses, and costs;

5.      Post-judgment interest as allowed by law; and

6.      Such other and further relief as the Court may deem just and proper.


                        Respectfully submitted,


                        OWENS, CLARY & AIKEN, L.L.P.


                        By: _____
                            Robert Clary
                            State Bar No. 04325300
                            Dana M. Campbell
                            State Bar No. 03697980

                        700 North Pearl St., Suite 1600
                        Dallas, Texas 75201
                        Telephone: 214-698-2100
                        Fax: 214-698-2121
                        Email: rjclary @oca-law.com
                        Email  dcampbell@oca-law.com

                        ATTORNEYS FOR PLAINTIFF
                        AND QUI TAM RELATOR