# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| *ex. rel.* BECKY RAMSEY-LEDESMA, | § | CASE NO. 3:14-CV-0118-M |
| | § | |
| Plaintiff/Relator, | § | |
| | § | |
| | § | |
| CENSEO HEALTH, L.L.C., MARK | § | Judge Barbara M.G. Lynn |
| DAMBRO, JAMES EDWARD BARRY | § | |
| GREVE, JR., JOY RIDLEHUBER, | § | |
| ALTEGRA HEALTH, INC., HUMANA | § | |
| INC., TUFTS HEALTH PLAN MEDICARE | § | |
| PREFERRED, TUFTS ASSOCIATED | § | |
| HEALTH PLANS, INC. d/b/a TUFTS | § | |
| HEALTH PLAN MEDICARE PREFERRED | § | |
| and TUFTS ASSOCIATED HEALTH | § | |
| MAINTENANCE ORGANIZATION, INC., | § | |

Defendants.

## SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

Plaintiff/Relator Becky Ramsey-Ledesma ("Ramsey" or "Relator"), a former

employee of Censeo Health, L.L.C., by and through her undersigned counsel, brings this *qui tam*

action in the name of the United States of America and alleges and states as follows:

## I.    NATURE OF THE CASE.

1.    This matter is brought pursuant to the False Claims Act, 31 U.S.C. § 3729,

*et seq.*, to recover damages, civil penalties, and other remedies available under the False Claims

Act.  This action arises from Defendants' knowing creation and/or submission of false records,

statements and/or claims in order to inflate the monthly capitation payments that the federal

government paid to Defendants Humana, Inc. ("Humana"), Tufts Health Plan Medicare

Preferred, Tufts Associated Health Plans, Inc., d/b/a Tufts Health Plan Medicare Preferred,

and/or Tufts Associated Health Maintenance Organization, Inc. (the Tufts entities named herein are collectively referred to as "Tufts") pursuant to Medicare Part C ("Medicare Advantage"). Humana and Tufts received millions of dollars in payments that they were not entitled to because they – with the help of Defendants Censeo Health, L.L.C. ("Censeo"), Altegra Health, Inc. ("Altegra"), Mark Dambro ("Dambro"), James Edward Barry Greve, Jr. ("Greve") and Joy Ridlehuber ("Ridlehuber") – wrongfully inflated the Medicare risk adjustment scores of their Medicare Advantage members in order to generate higher capitation payments.  This is precisely the type of improper conduct that the False Claims Act is meant to remedy.

2.      Humana and Tufts are Medicare Advantage Organizations ("MAOs") that administer the Medicare Advantage program, providing health insurance for Medicare-eligible citizens who participate in the Medicare Advantage program.  The Medicare Advantage program, through the Centers for Medicare and Medicaid Services ("CMS"), makes prospective monthly capitation payments to Humana and Tufts for insuring their members.  Those capitation payments are based on the demographic and health risk information of the Medicare Advantage members each MAO insures.

3.      To ensure that the capitation payments are properly risk-adjusted, the MAOs are required to provide CMS with diagnosis codes reflecting their members' physical problems. The codes presented by an MAO during a reporting period determine the risk-adjusted capitation payments that MAO receives during the subsequent twelve-month period. Accordingly, the greater the health risk of the MAO's membership, as reflected in the codes presented during a reporting period (*i.e.*, the worse their diagnoses), the higher the monthly capitation payments that the MAO receives during the 12 months following the end of the reporting period.  The MAOs thus have a financial incentive to submit high-risk diagnoses codes

to CMS, but an obligation to base such submissions on documentation and support mandated by strict rules and regulations, as described herein.

      4.     Diagnosis codes must be based on a medical record created during a face-to-face patient encounter within the past 12 months.  Humana and Tufts retained Defendant Censeo (i) to select high risk insureds to receive in-home health risk assessments; and (ii) on the basis of these in-home assessments, to create "medical records" based on face-to-face patient encounters.  This was done for the sole purpose of generating high-risk diagnoses that the MAOs could submit to CMS to increase their capitation payments.

      5.     Censeo, and Censeo executives Dambro, Greve, and Ridlehuber (the "Censeo Defendants"), created artificially high-risk diagnoses for Humana and Tufts in two primary ways.

      6.     First, the Censeo Defendants hired physicians – most of whom were radiologists – to visit members' homes and assess the members from head to toe in 45 minutes to an hour in order to create the so-called "medical records" based on face-to-face encounters. Despite the fact that most of the MAO members selected by Censeo's algorithm had no need to see a physician within the past 12 months (or they would already have had a face-to-face encounter), Censeo's physicians routinely diagnosed high-risk conditions ranging from serious heart conditions to uncontrollable diabetes to chronic major depression, and everything in between.  These physicians, who typically saw up to ten members per day – often in geographically dispersed areas – failed to conduct the laboratory or other diagnostic tests required to make these serious "diagnoses."  Instead, these purported diagnoses were based on nothing more than a prepopulated patient history form, a patient medication list, the MAO

member's own oral reports, and a cursory examination of that member and the environment in which the member was living.

7.      The Censeo Defendants created a "check-the-box" health assessment form for the purpose of documenting these unsupported "diagnoses," which the MAOs reviewed and approved.  Despite the alleged seriousness of the "diagnoses" Censeo's physicians found, Censeo and its physicians expressly disclaimed any responsibility for providing the assessed members with treatment and provided no patient care.  Further, Censeo failed to provide the health assessment form to the member's primary care physician, and failed to inform the primary care physician as to the reason why Censeo sent its own physician to see the primary care physician's patient.  In fact, many primary care physicians were so perplexed as to why Censeo had sent a doctor to see his/her patient that they would call Censeo for an explanation.  Ramsey has personal knowledge that this occurred on a regular basis.

8.      Second, the Censeo Defendants hired and instructed inexperienced, apprentice coders to convert the information on the health assessment forms to codes that Censeo submitted to Medicare.  The Censeo Defendants instructed coders it employed, as well as those employed by third-party vendors, including Altegra, to code the purported "diagnoses" on these forms even though they were plainly not supported by the medical record (and which radiologists cannot typically diagnose), and that would not have been coded by any experienced coder following well-established, mandatory coding guidelines.  For example, Censeo coded:

- Chronic major depression – properly diagnosed only by mental health specialists (not radiologists) after extensive examination – based solely on a member's answers to two simple questions;

- Spinal stenosis also based on the answer to two basic questions ("are your feet numb?" and "do you have weakness in your arms, legs or feet?"), even though this condition cannot be diagnosed without diagnostic imaging such as CT scans or x-rays, which was never performed at the in-home assessments; and

- COPD, which requires a spirometer test or other diagnostic testing to diagnose, even though it was clear to the coders that no such testing was performed at the in-home assessments.

9. Further, the Censeo Defendants instructed coders to create diagnosis codes for an assessed member even if the physician who conducted the assessment and filled out the check-the-box assessment form had <u>not</u> made the corresponding diagnosis on the health assessment form. Specifically, Censeo coders were repeatedly and clearly instructed to extract diagnosis codes based solely on the coder's review of the members' medication list, often using a "google search" to find a diagnosis associated with the medication. Censeo's coders did so even when the physician did not "check the box" for a diagnosis related to that medication. For example, Censeo coded:

- Peripheral neuropathy or diabetic neuropathy any time a member was prescribed capsaicin, even though this drug is also frequently used to treat much more mild conditions, including shingles and high blood pressure; and

- Rheumatoid arthritis whenever a member was prescribed NSAIDs, which are some of the most commonly prescribed general pain medications used to treat a variety of much less serious conditions, including headaches.

10. In short, coders were instructed to code high-risk diagnoses – also referred to as "money codes" – that would increase the MAOs' capitation payments, even though there was no *bona fide* medical record supporting those diagnoses.

11. Humana and Tufts approved Censeo's in-home assessment form and coding guidelines and practices, and gave Censeo *carte blanche* to create and submit codes to CMS on their behalf, knowing those "money codes" were based on Censeo's improper practices. Both the MAOs and Censeo certified, as a condition for the MAOs' entitlement to receive payment from CMS, that the risk adjustment data those claims were based upon were accurate, complete and truthful.

12.     Relator Ramsey, a Certified Professional Coder ("CPC") with over fifteen years of coding experience, was employed by Censeo as a "lead" coder and witnessed these improprieties first hand.   When Censeo learned that Ramsey objected to Censeo's improper coding practices, she was promptly fired.

13.     Through their scheme, described more fully below, Defendants knowingly violated the False Claims Act.

## II.     THE FALSE CLAIMS ACT.

14.     The False Claims Act imposes liability on anyone who:  "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), . . .  or (G); . . . or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . . . "  31 U.S.C. § 3729(a)(1).

15.     Any person who violates the False Claims Act is liable for civil penalties of up to $11,000 per false claim, plus three times the amount of damages sustained by the federal Government.

16.     The False Claims Act allows any person having information about false or fraudulent claims to bring an action on behalf of the federal Government and to share in any recovery.  Based on these and other provisions of the False Claims Act, the Relator, on behalf of the United States, seeks to recover damages and civil penalties arising from Defendants' violations of the False Claims Act.

### III.     THE PARTIES, JURISDICTION AND VENUE.

17.     The Relator is authorized to bring this action on behalf of the United States pursuant to 31 U.S.C. § 3730(b).

18.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1345, and 1367, and also pursuant to 31 U.S.C. § 3732(a), which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

19.     Venue is proper in this District and Division pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) because certain parties reside here and certain of the acts giving rise to the claims described herein occurred here.

20.     Ramsey is a citizen of the United States and the State of Texas and currently resides in Collin County, Texas.  Ramsey is filing here as qui tam Relator on behalf of and in the name of the United States (the "Government") under the authority conferred by 31 U.S.C. § 3730(b), seeking damages and civil penalties against the Defendants for violations of 31 U.S.C. § 3729(a).

21.     Defendant Censeo is a Delaware limited liability company with its principal place of business in Dallas, Texas, which is located within this District.

22.     Defendant Dambro is an individual residing in Fort Worth, Texas.  At all times relevant hereto, Dambro was Censeo's Chief Medical Officer.

23.     Defendant Greve is an individual residing in Arlington, Texas. At all times relevant hereto, Greve was Censeo's General Counsel and Chief Compliance Officer.

24.     Defendant Ridlehuber is an individual residing in Carrollton, Texas, at a residence located within this District. At all times relevant hereto, Ridlehuber was Censeo's Director of Quality.

25.     Defendant Altegra is a Delaware corporation with its principal place of business in Miami Lakes, Florida.

26.     Defendant Humana is a Delaware corporation with its principal place of business in Louisville, Kentucky.

27.     Defendant Tufts Health Plan Medicare Preferred is a Medicare Advantage Plan ("Tufts MAO") that is owned, operated and controlled by Defendant Tufts Associated Health Plans, Inc.  Defendant Tufts Associated Health Plans, Inc. is a Delaware corporation with its principal place of business in Watertown, Massachusetts.

28.     Defendant Tufts Associated Health Maintenance Organization, Inc. is a Massachusetts nonprofit corporation with its principal place of business in Watertown, Massachusetts, and is the Tufts entity that contracted with Censeo for the services described herein.  Tufts Associated Health Maintenance Organization, Inc. entered into its contract with Censeo so that Censeo could gather risk assessment data for the Tufts MAO.

IV.     **MEDICARE ADVANTAGE RULES AND REGULATIONS.**

29.     Under Medicare Advantage, Medicare beneficiaries can opt out of traditional fee-for-service coverage and, instead, enroll in Medicare Advantage plans, which are privately run plans that provide coverage for the same services.  42 U.S.C. § 1395w-21, *et seq*. MAOs, like Humana and Tufts, are insurance companies that administer such plans. CMS, a division of the Department of Health and Human Services, is responsible for the administration and supervision of Medicare Advantage.   MAOs, including Humana and Tufts, must be approved by CMS, must comply with CMS guidelines, and, as described below, are required to attest that they have done so as a prerequisite to receiving payment.

30.     Federal regulations establish clear conditions for insurers like Tufts and Humana to participate in Medicare Advantage.   Among other things, they must complete a

standardized application, sign a contract that contains mandatory provisions (the "Medicare Advantage Contract Form"), and implement a compliance program to prevent, detect and correct non-compliance with federal requirements.  42 C.F.R. § 422.503(a).

31.     To participate in the Medicare Advantage program, each MAO, including Tufts and Humana, submitted an application in which it agreed "to abide by the terms of the Medicare Advantage Contract and/or contract addendum."  In its contract, each MAO agreed to comply with, among other things: (a) the Social Security Act 42 U.S.C. § 1395 *et seq*.; (b) Medicare regulations, 42 C.F.R. Part 422 *et seq*.; (c) the Medicare Managed Care Manual; and (d) all federal laws and regulations designed to prevent fraud, including the False Claims Act.  42 C.F.R. § 422.504.

32.     Each MAO also agreed to certify the "accuracy, completeness, and truthfulness" of all data submitted to CMS on its behalf "as a condition for receiving a monthly payment."  This data specifically includes the risk assessment data the MAOs submit to CMS for the purpose of calculating monthly capitation payments. 42 C.F.R. §§ 422.504(l)(1)-(1)(3); 42 C.F.R. §§ 423.505(k)(1)-(3).  Thus, as a condition to receiving capitation payments, each MAO must expressly certify that the risk assessment data it submitted to CMS, or that was submitted to CMS on its behalf, is accurate, complete and truthful.  42 C.F.R. § 422.504(l); 42 C.F.R. §§ 423.505(k)(1)-(3).

33.     Further, federal regulations are clear that each MAO bears ultimate responsibility to ensure full compliance with these requirements even if it elects to subcontract work that it was required to perform under its contract with CMS to third-party vendors. Specifically, the regulations provide that "[n]otwithstanding any relationship(s) that the MA organization may have with first tier, downstream, and related entities, the MA organization

maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS." 42 C.F.R. § 422.504(i). As to the MAOs, including Humana and Tufts, (i) Censeo is a "first tier" entity and (ii) Altegra is a "downstream entity." 42 C.F.R. § 422.500(b) (defining both).

34.     Like the MAOs, subcontractors like Censeo and Altegra are required to certify the accuracy, completeness and truthfulness of all risk assessment data. 422.504(l)(3); 42 C.F.R. §§ 423.505(k)(3).

35.     Federal regulations also require each MAO to commit to CMS that any contract between the MAO and Censeo will include the following mandatory provisions:

- A provision that "any services or other activity performed" by Censeo will be "consistent and comply with the MA organization's contractual obligations" to CMS (42 C.F.R. § 422.504(i)(3)(iii));

- A provision specifying the "delegated activities and reporting responsibilities" assigned to Censeo (42 C.F.R. § 422.504(i)(4)(i));

- A provision in which Censeo agrees to "comply with all applicable Medicare laws, regulations, and CMS instructions" (42 C.F.R. § 422.504(i)(4)(v));

- A provision in which Censeo agrees that the MAO will monitor Censeo's performance "on an ongoing basis" (42 C.F.R. § 422.504(i)(4)(iii)); and

- A provision that, in the event Censeo does not perform to the satisfaction of the MAO or CMS, then the MAO will either have the right to revoke its delegation of activities and reporting requirements to Censeo or to exercise other specified remedies. (42 C.F.R. § 422.504(i)(4)(ii)).

36.     Thus, Tufts and Humana each retained the capacity to assess Censeo's performance, provide instructions to Censeo, and terminate their relationship with Censeo.

37.     Further, CMS "holds the MA organization accountable for the content of submissions regardless of who submits the data." (CMS 2013 National Technical Assistance Risk Adjustment 101 Participant Guide, Section 2.1.)

A.    **CMS's Monthly Capitation Payments are Based on Patient Demographics and Risk Adjustment Data.**

38.    CMS makes monthly capitation payments to each MAO based on risk adjustment data submitted by the MAO during the preceding year.  42 C.F.R. § 422.304.  CMS considers both demographic information and the health risk (*i.e.*, diagnoses) of the patients serviced by an MAO in calculating these payments. 42 C.F.R. § 422.308.

39.    CMS's payment model is referred to as the CMS-Hierarchical Condition Category Model ("HCC").  Federal regulations define HCCs as "disease groupings consisting of disease codes (currently ICD–9–CM codes) that predict average healthcare spending."  42 C.F.R. § 422.2. MAOs like Humana and Tufts submit risk adjustment data for their members in the form of HCC codes.  42 C.F.R. § 422.310(b).  CMS uses these data reports to "risk adjust" the capitation rates to be paid to each MAO in the following year.

40.    The capitation payments are prospective, meaning that CMS considers demographic and risk information from the prior 12 months in order to calculate total payments for the following year. 42 C.F.R. § 422.308(c) and (e); 42 C.F.R. § 422.310(g). Thus, the HCC disease categories assigned to the MAOs' members in the prior 12  months dictate the capitation payments that CMS pays during the next payment year.  This prospective payment system is known as "risk adjustment."   The diagnoses codes that MAOs like Humana and Tufts submit to CMS are referred to as "risk adjustment data."

41.    The CMS-HCC Model compensates MAOs on the assumption that MAOs having higher-risk insureds will be required to pay more for their insureds' medical care, and, thus, should be compensated at a higher level than MAOs whose members are relatively healthier.  Thus, if an MAO can demonstrate through *bona fide* medical records that its members

have higher risk profiles (*i.e.*, members with relatively more severe diagnoses), the MAO will receive higher monthly payments from CMS.

> **B.      Federal Regulations and Requirements for Risk Adjustment Data and Coding.**

42.      Federal regulations are clear that the risk adjustment data submitted by MAOs like Humana and Tufts "must … conform to the requirements for equivalent data for Medicare fee-for-service when appropriate, and to all relevant national standards." 42 C.F.R. § 422.310(d).  In other words, risk adjustment data must meet the same standards as similar types of data that would be submitted for fee-for-services reimbursement.  Thus, diagnoses and coding that would be unacceptable to CMS in the fee-for-services context are likewise unacceptable when presented to CMS by the MAOs.

43.      Federal regulations are also clear that the diagnosis codes that MAOs submit must be supported by properly documented medical records. CMS requires that all diagnostic information (and the diagnostic codes derived therefrom) must be obtained through a face-to-face encounter between the patient and a physician. The treating physician must document the facts supporting the diagnosis in the patient's medical record and must sign the record.  (*See* 2008 CMS Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide, Section 7.1.5 RADV ("RADV Participant Guide"); 2008 CMS Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations § 10(d) ("RADV Technical Guide") (medical record must be signed)). Further, to qualify for inclusion in the risk-adjustment process, a "medical record" reflecting a plan participant's face-to-face encounter with a provider must be created within the defined 12-month period preceding submission of the risk adjustment data to CMS, as described in federal regulations.  42 C.F.R §. 422.310(g); RADV Technical Guide § 10(b).  CMS guidelines also set out requirements for all

diagnoses submitted for payment (*e.g.,* used for Hierarchical Condition Categories). They must be:

- Documented in a medical record that was based on a face-to-face health service encounter between a patient and a healthcare provider;

- Coded in accordance with the ICD-9-CM Guidelines for Coding and Reporting ("ICD-9-CM Guidelines");

- Assigned based on dates of service within the data collection period; and

- Assigned by an acceptable Risk Assessment provider type and Risk Assessment physician specialty.

(RADV Participant Guide § 7.1.5.)

44.     The CMS Manual for Medicare Managed Care also explains risk adjustment data requirements. (*See* CMS Manual System, Pub. 100-16 Medicare Managed Care, Transmittal 118 ("CMS Manual Trans. 118"); Medicare Managed Care Manual Ch. 7 ("CMS Manual").) The CMS Manual Trans. 118 provides that MAOs must "[e]nsure the accuracy and integrity of risk adjustment data submitted to CMS" and that diagnostic codes must be coded "according to International Classification of Diseases (ICD) Clinical Modification Guidelines for Coding and Reporting." (*See also* CMS Manual § 40.)

45.     In short, CMS relies upon the MAOs to assign accurate ICD-9-CM codes so that CMS can place each MAO member in his/her correct HCC category and properly risk-adjust capitation rates.

46.     Not all diagnoses affect capitation payments. Risk-adjusted capitation payments are adjusted higher only if the MAO can demonstrate through a *bona fide* medical record that its enrollees were diagnosed with a major medical condition, such as diabetes, cancer or heart disease, during the relevant reporting period. An MAO participant diagnosed with more serious conditions is deemed likely to receive more services from his or her MAO, thereby

entitling the MAO to a higher capitation payment for that participant. Accordingly, the MAOs have a financial incentive to generate "medical records" every 12 months to support their submission of codes to CMS reflecting documented and supported serious medical conditions suffered by their insureds.

47.     When an MAO assigns unsupported (or improperly supported) ICD-9-CM codes to its members and submits those codes to CMS, that data will improperly skew the risk-adjusted capitation payments that the MAO receives from Medicare for the succeeding payment year.

## V.     DEFENDANTS IMPROPERLY INFLATED MEMBERS' RISK ADJUSMENT CODES FOR THE PURPOSE OF INCREASING CAPITATION PAYMENTS.

48.     Defendants engaged in a plan to inflate risk scores and, hence, the capitated payments to the MAOs.  Defendants carried out this scheme in two independent ways. First, the Censeo Defendants instructed their physicians to document purported "diagnoses" that were not supported by necessary laboratory results or other diagnostic testing.  Second, the Censeo Defendants instructed Censeo and Altegra coders to code for these unsupported diagnoses, as well as for conditions that simply were not diagnosed at all, even though it was clear from the face of the assessment forms that the diagnoses (and, thus, the codes) were not supported.  These illegal practices resulted in up-coding, and Censeo submitted these inflated codes to CMS at the direction of Tufts and Humana in order to support the MAOs' alleged entitlement to higher capitation payments.  Censeo performed all of these actions with the knowledge and consent of, and under the direction and supervision of, both Humana and Tufts.

### A.     Censeo's Coding Department and Improper Coding Practices.

49.     Censeo itself (i) recruits physicians to perform home assessments and (ii) schedules home assessments with targeted members of each MAO.  However, prior to 2013,

Censeo hired third-party vendors, including Defendant Altegra, to actually extract the HCC codes from the assessment forms filled out by the Censeo-recruited physicians. At all relevant times, the third-party vendors with whom Censeo contracted to provide coding services, including Altegra, operated under Censeo's direction and control, and were required to, and did, follow Censeo's coding practices and instructions.

50.     At the end of the first quarter of 2013, Censeo employed fewer than ten of its own coders. Until that time, Defendant Altegra performed virtually all of the coding for Defendants Humana and Tufts. Ramsey was personally present at a meeting with Altegra's coding department's leads and executive team, the head of Altegra's information technology department and other Altegra executives in which the head of Altegra's coding department disagreed with a coding decision made by Ridlehuber, but ultimately relented, saying "We're going to do whatever you want, Joy." This same scenario happened on multiple occasions in telephone conferences between Ridlehuber and Altegra's representatives. Any time Altegra disagreed with Censeo's coding practices as announced by Ridlehuber, the Altegra representatives would capitulate and agree to adopt what they knew to be Censeo's improper coding practice.

51.     Ramsey specifically recalls a discussion between the Altegra representatives and Ridlehuber involving the coding of major chronic depression from the two questions set out in the assessment form. (Are you taking an antidepressant and, if so, were you sad or depressed before starting the antidepressant?) Altegra questioned the propriety of coding major chronic depression from the member's oral responses to the questions. When Ridlehuber persisted in her contention that it was proper to both diagnose and code from the responses,

Altegra conceded the point and agreed to continue to improperly code for major chronic depression on the basis of those responses.

52.     Altegra had specific coding guidelines for Censeo assessments that were different from its regular coding guidelines.  Altegra also told Ridlehuber in phone conferences in which Ramsey was present that it was conducting special training classes and using separate written materials for coding Censeo assessments.  These classes and materials were necessary because Altegra was following a different coding methodology – Censeo's coding methodology – when it coded Censeo's home assessments.

53.     Seeing an opportunity to enhance its own net income and exert even greater control over coding, Censeo began hiring more of its own coders in the second quarter of 2013, with a view toward moving a substantial amount of the coding work for its MAO clients in-house.  Censeo sought approval from its MAO clients, including Humana and Tufts, to move a substantial portion of the coding function in-house.  Both Humana and Tufts approved this transition.  In the second quarter of 2013, Censeo began performing some coding for its client MAOs in-house, but continued sub-contracting some coding out to Altegra.

54.     Ramsey is personally aware that (i) Censeo did significant coding in-house for both Humana and Tufts during 2013; and (ii) the coding done by Altegra for Humana and Tufts was done under Censeo's supervision and in accordance with Censeo's instructions.  On information and belief, Censeo currently performs the majority of Humana's coding in-house.  Further, on information and belief, and since approximately July 2013, Censeo performed most of Tufts' coding in-house, until Tufts terminated Censeo in 2015.

55.     In connection with its efforts to move coding in-house, Censeo hired Ramsey to be the "lead" coder in March of 2013.  At all relevant times, Ramsey reported to, and worked closely with, Defendant Ridlehuber, Censeo's Director of Quality.

56.     As lead coder, Ramsey routinely participated in meetings with Censeo coders, Ridlehuber, and Censeo's coding trainer.  Ramsey also participated in conferences with Ridlehuber and the MAOs, including Humana and Tufts, during which Censeo's in-home assessment form, assessment practices, and coding practices were discussed.

57.     Further, Ramsey routinely witnessed telephone calls between Censeo physicians and Censeo's quality control team, the members of which reported directly to Defendant Ridlehuber.  The quality control team regularly interacted with Censeo-recruited physicians who had failed and/or refused to complete the assessment forms in a manner satisfactory to Censeo.

58.     In her position as lead coder, Ramsey personally observed that Censeo's coding practices and policies violated CMS requirements.  She also observed that Defendants Dambro, Greve and Ridlehuber all participated in the development and enforcement of Censeo's improper coding practices and policies.

59.     In connection with Censeo's request to move coding in-house, Humana asked for a copy of Censeo's coding manual in July 2013.  At that time, however, Censeo did not have a coding manual.  Accordingly, Ridlehuber hastily prepared a coding manual for Humana's review and approval (the "Coding Manual").  Defendants Greve and Dambro reviewed and approved the Coding Manual.

60.     Notably, the Coding Manual memorialized Censeo's improper practices and policies, which were already in place and which Censeo had required Altegra to follow as

well.  For example, the Coding Manual articulated Censeo's policy that codes could and should be derived from prescribed medications alone:

> [c]ode diagnoses from the medications currently being used. . . . Diagnoses can be coded from this list **whether or not their boxes are marked later in the evaluation**. (emphasis added)

61.     Thus, Humana was aware of Censeo's existing improper coding policies and practices, which Censeo utilized throughout the time that Ramsey was employed by Censeo.

62.     Tufts also requested, and was provided with, a copy of the Coding Manual in July 2013.  Thus, Tufts was also aware of the improper coding policies and practices that Censeo had been implementing on its behalf.

63.     Virtually all of the coders hired by Censeo were "apprentice" coders who had less than the two years of experience required to be classified as Certified Professional Coders without the "apprentice" qualification.  Retaining only apprentice coders benefitted Censeo because such coders lacked the experience and knowledge required to question Censeo's improper coding practices.  Indeed, the apprentice coders fully complied with Censeo's improper coding directives, described in greater detail below.

**B.     Censeo Created Unsupported High-Risk Diagnoses.**

64.     For each in-home assessment, Censeo gave the recruited physicians a prepopulated assessment form.  The prepopulated form contained information concerning the member to be assessed that Censeo had received from the member's MAO, including: the member's demographic information, current conditions and diagnoses, prescribed medications, past medical procedures, and other historical data relating to the member.

65.     Defendant Dambro was largely responsible for authoring the assessment form.  Ridlehuber told Ramsey that the assessment form was "Dr. Dambro's baby."  However, Greve and Ridlehuber also contributed to the content of the assessment form.

66.     The Censeo Defendants provided the MAOs with the assessment form, and, during her employment, Ramsey heard Ridlehuber discuss the assessment forms with various MAOs, including Humana and Tufts.  Ridlehuber created an outline of topics to address with the MAOs for this purpose, which specifically included Censeo's improper directive that coders "can code from [the medication list] whether diagnosis boxes marked or not."  Further, Ramsey participated in several telephone conferences presided over by Ridlehuber in which Censeo's assessment form, and the practices followed by Censeo in deriving codes from the assessment forms, were discussed with the MAOs, including Humana and Tufts, in detail. During these conferences, Ridlehuber would explain the assessment form and Censeo's coding practices to the MAOs, using her outline as a guide.  Thus, the MAOs had input into the assessment form, and direct knowledge of Censeo's improper coding practices.

67.     Censeo's physicians completed the assessment forms based exclusively on historical data provided by the MAOs, self-reported information from the member, and limited observations made during the brief in-home assessment. Censeo's physicians did not perform any invasive procedure or test.  Indeed, Censeo's website described the process as follows:

> What will happen during the visit?
>
> The visiting provider will review your medical history, any current treatments, and medications you may be taking.  There will also be a brief physical exam performed which includes your blood pressure and pulse being taken.  ***There will not be any invasive procedures performed***.

68.     In 2013 Censeo issued a press release announcing that "[d]uring the 45-60 minute consultation, one of Censeo Health's 10,000 licensed physicians will … conduct simple lab tests…."  But Relator Ramsey has contrary personal knowledge that: (i) all coding was done strictly from the information set out in the assessment forms; and (ii) the assessment forms never contained results from lab tests allegedly administered during the home assessments.

69.     Censeo's assessment form is a self-guided "check-the-box" form.   The conditions reflected on the evaluation forms are not actual diagnoses. They are merely self-reported conditions, or conditions captured from the medical history that, in some cases, are verbally confirmed by the MAO member.   This violates CMS's requirements, for CMS is clear that "medical history alone may not be used as a source of diagnosis for risk adjustment purposes."  (CMS 2013 National Technical Assistance Risk Adjustment 101 Participant Guide, Page 17.)

70.     During Ramsey's employment, Censeo assigned each physician to conduct as many as ten in-home assessments in geographically dispersed areas on the same day. Censeo's policy was that each 26-page assessment form should take no more than 45-60 minutes to complete.   Censeo generally did not reimburse doctors for gas or mileage to reach the homes of those members they were scheduled to examine.   Further, Censeo paid the physicians a flat fee of $100 per assessment.   In short, Censeo incentivized, and pressured, its physicians to complete as many assessments as possible and to perform them in as little time as possible.

71.     Most of Censeo's physicians were unemployed or underemployed radiologists.   Ridlehuber described them to Ramsey as "the bottom of the barrel."   Censeo pressured the radiologists to rapidly make numerous high-risk diagnoses that were totally unrelated to their area of practice.   Notably, CMS has been clear that, as to in-home assessments performed by physicians, "only diagnoses from risk adjustment acceptable physician specialty types may be submitted for payment purposes."  (April 6, 2015 Announcement of Calendar Year 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter ("April 2015 Final Call Letter"); *see also* CMS Manual Trans. 118, Section 120.1.1; CMS 2013 National Technical Assistance Risk Adjustment 101 Participant

Guide, Section 3.2.2.4.)   But, as CMS's own guidelines state, radiologists are not usually accepted specialty types for diagnostic purposes, even when they are engaged in work related to their area of expertise (*e.g.*, radiology), which was not the case with regard to the home visits. (CMS Manual Trans. 118, Section 120.1.1; CMS 2013 National Technical Assistance Risk Adjustment 101 Participant Guide, Section 3.2.2.4.)

72.   Critically, Censeo instructed its physicians to "diagnose" conditions – conditions that would result in higher capitation payments to its MAO clients – even though such conditions could not be diagnosed without appropriate laboratory or diagnostic testing.   They routinely diagnosed high-risk conditions that were not supported by required testing, including diabetic retinopathy, chronic major depression, spinal stenosis, cachexia, and COPD.   As a result, and as is set forth in greater detail below, Altegra and Censeo coders relied on these unsupported diagnoses to improperly code conditions for submission to CMS.

73.   When physicians objected to making diagnoses without appropriate laboratory results or diagnostic testing, Censeo insisted that they continue to make such diagnoses.   Ramsey witnessed members of Censeo's quality control team instruct the physicians that they must follow the protocol established by the Censeo Defendants and set forth on the Censeo assessment form even when the physicians resisted compliance.   The vast majority of the doctors did what they were told.

**C.   Censeo Instructed Coders to Code Based on Medications Alone, to Code Undiagnosed Conditions, and to Code Otherwise Unsupported Diagnoses.**

74.   After the assessment forms were completed, they were provided to Altegra and/or Censeo coders, who generated and submitted codes to CMS based solely on the information contained in the completed forms.   Censeo, acting on behalf of the MAOs, improperly instructed both Altegra and Censeo coders to derive codes based on medications

listed in the forms alone, to code unsupported diagnoses and to code otherwise undiagnosed conditions. As a matter of practice, the coders complied.

### (i)     Censeo Instructed Coders to Code From the Medication List Alone.

75.     Altegra and Censeo coders were instructed to code diagnoses based solely on the medications listed on the assessment form. Coders were expected to look at the list of medications, and pick a diagnosis that <u>might</u> correlate with that medication, even if the assessing physician did <u>not</u> make that diagnosis.

76.     Censeo issued these improper instructions orally and in writing. While Ramsey was at Censeo, the coders had no written manual setting out Censeo's coding procedures. Ridlehuber's "Coding Manual" was never distributed to the coders while Ramsey was employed by Censeo.

77.     Consistent with Ridlehuber's direction, Censeo's coding trainer instructed the coders to code from the medication list alone, stating "Don't make things harder than they are – go straight to the medication list." The Coding Manual later confirmed and memorialized these instructions, which were already in place and were followed by both Altegra and Censeo coders prior to Ridlehuber's creation of the Coding Manual.

78.     Ramsey routinely witnessed coders performing in conformity with Censeo's improper instructions. Upon opening an assessment form, coders would typically perform three steps. First, they would review the medications identified on the assessment form. Second, they would review the historical "documented diagnoses" to determine if a medication could be linked to any <u>previously</u> diagnosed conditions. Third, they would review "diagnoses" checked by the Censeo physician and attempt to link any listed medications to those diagnoses. If there was a diagnosis that could arguably be linked to a listed medication, the coders would

code that diagnosis. They would do so even when the Censeo physician who completed the assessment form did not link the medication and diagnosis.

79.     Further, even when the Censeo physician had not made <u>any</u> diagnosis that could be linked to a particular medication, the coders would nonetheless use the medication to, in effect, diagnose the condition themselves and "pick up" a high-risk code.

80.     When coders did not know which high-risk condition a medication might be used to treat, they would regularly "google" that listed medication, substituting their own internet search for an actual, supported diagnosis by a treating physician. Further, the assessment form itself guided coders to specific high-risk diagnoses even when no diagnosis had actually been made by the Censeo physician. The form itself  instructed coders (and physicians) that certain medications were "supportive" of high-risk diagnoses. For instance, the form instructed coders that diuretics, ACE inhibitors, angiotensin-receptor blockers, and digoxin "are supportive for" congestive heart failure. Similarly, the form instructed coders that ACE inhibitors, statins, and advice to avoid NSAIDs "are supportive for" chronic kidney disease. Such instructions were intended to (and did) guide coders to code for these and other high-risk diagnoses based on prescribed medications alone.

81.     Ramsey observed that coders frequently relied upon medications to "pick up" codes even where there was no corresponding diagnosis to support the code. This practice is particularly reprehensible – and leads to upcoding – for two reasons. First, many medications are used to treat a variety of unrelated conditions, including innocuous conditions having nothing to do with a chronic disease. Second, the fact that an insured was at one time prescribed medications is no guaranty that the condition persists.

82.     For instance, warfarin (also known by the brand-name, Coumadin) was relied upon to code atrial fibrillation, peripheral vascular disease, deep vein thrombosis, or angina, but those drugs can also be prescribed for less serious conditions.  Warfarin is routinely prescribed to prevent the formation of blood clots following certain surgeries, including knee and hip replacements.  Similarly, if an assessed member was prescribed Risperdal, Censeo's coders "picked up" schizophrenia, even though that drug can also be prescribed to treat senility.

83.     By coding high-risk diagnoses based on medications where the Censeo-recruited physicians had not actually made the diagnoses, Altegra and Censeo coders were, in effect, inferring their own diagnoses.  This practice led to up-coding because the codes were wholly unsupported by appropriate medical records.  The practice also violated CMS rules and ICD-9-CM coding guidelines, which do not permit coding based on prescribed medications alone.

84.     Ramsey is aware that numerous diagnoses were routinely coded based on the prescribed medications alone, even when the physicians performing the assessments did not check an appropriate diagnosis box on the assessment form.  Examples of the coding that was impacted are set out below:

85.     Rheumatoid arthritis.  Censeo instructed coders to code for rheumatoid arthritis, another "high-value" diagnosis, whenever certain nonsteroidal anti-inflammatory drugs ("NSAIDs") were prescribed, such as Celebrex or Naproxen.  In reality, NSAIDs are not limited to the treatment of rheumatoid arthritis.  They are some of the most commonly prescribed general pain medications for adults.

86.     Peripheral neuropathy and diabetic neuropathy. Censeo instructed coders to rely upon capsaicin to code for peripheral neuropathy and diabetic neuropathy, both "high-

value" diagnoses.  But capsaicin is also used as an anti-depressant, an anti-seizure drug, and to treat shingles, neuralgia, arthritis, and high blood pressure, which are conditions that yield "lower-value" diagnoses.  Thus, a valid medical diagnosis cannot be based solely on the fact that the assessed member has a prescription for capsaicin.

87.     <u>Angina.</u>   Angina was routinely "picked up" and coded on the basis of medication alone, even if the Censeo physician never actually diagnosed it.  Indeed, Censeo's assessment form instructed its recruited physicians as follows: "[i]f taking medication for angina, diagnose Angina [sic] and skip this section."  Censeo was clear that this directive applied to coders as well as physicians.  Censeo and Altegra coders complied with the directive:  as a matter of practice, when the assessment form indicated that the patient was taking any medication that could also be used to treat angina, the coders would code for angina.  For instance, any time that warfarin (or Coumadin) was prescribed, the coders would code for angina.  This was done even when there was no other indication on the assessment form that a patient actually had angina.

### (ii)   Censeo Instructed Coders to Code High-Risk Diagnoses That Were Not Supported By the Assessment Form.

88.     Censeo also instructed Altegra and Censeo coders to code for high-risk diagnoses that were not properly supported by the completed assessment forms.  Specifically, coders were instructed to code conditions that Censeo physicians "diagnosed" even when those diagnoses were plainly not properly supported, and were obviously outside the radiology physicians' specialty area.

89.     Among high-risk diagnoses that Ramsey routinely saw coded in this manner were diabetic retinopathy, chronic major depression, spinal stenosis, and COPD.  Censeo instructed Altegra and Censeo coders to code for those conditions when they were marked as

diagnosed on the assessment form, although the diagnoses were plainly unsupported.  Coders routinely complied with these instructions, as set forth below.

90.    <u>Chronic major depression.</u>   Censeo instructed physicians to diagnose "chronic major depression" based only on the assessed members' responses to two questions: Are you taking an antidepressant and, if so, were you sad or depressed before starting the antidepressant?

91.    Chronic major depression cannot possibly be diagnosed based solely on responses to those two questions, especially when presented to a non-psychiatrist during the course of a short interview designed to cover a patient's entire medical condition.  Further, even where depression is diagnosed, it can never be inferred that such depression is "major recurrent depression" without additional physician documentation regarding the type of depression.  The assessment form did not seek or provide an opportunity for such additional documentation.

92.    Before diagnosing a patient with depression, other causes for depressive symptoms must be ruled out.  For instance, depressive symptoms may be due to other psychological conditions, such as bereavement or substance abuse.  Depressive symptoms can also be caused by other medical conditions, such as thyroid disorders, which are commonly associated with depressive symptoms.  Thus, by incorporating directives to its physicians (and coders) concerning the diagnosis of chronic major depression – by literally instructing them to make a medical diagnosis of (and to code for) chronic major depression based solely on the MAO members' oral responses to two questions - Censeo was ensuring upcoding for that condition.

93.    Further, pursuant to CMS rules, chronic major depression must be diagnosed by an "acceptable physician specialty type." (*E.g.*, April 2015 Final Call Letter;

*see also* CMS Manual Trans. 118, Section 120.1.1.)  Censeo's physicians, who were primarily radiologists, were clearly not "acceptable physician specialty types" for purposes of diagnosing chronic major depression.  Nonetheless, Censeo instructed coders to code this condition when it was marked as "diagnosed" as described above.  Coders routinely complied, although doing so was improper.

94.     Spinal Stenosis.  Censeo instructed physicians to diagnose spinal stenosis, a "high-value" diagnosis, based on the answers to just two questions:  "Are your feet numb," and "do you have weakness in arms, legs or feet?"  Spinal stenosis is the narrowing of the bone channel surrounding the spinal cord.  It can be difficult to diagnose as its symptoms resemble many age-related conditions and/or injuries.

95.     Spinal stenosis cannot be diagnosed without diagnostic imaging such as x-rays, CT scans or MRIs.  Nonetheless, Censeo's recruited physicians frequently purported to diagnose spinal stenosis based on nothing more than members' oral responses to the two questions set forth above.  Ramsey personally observed many assessments containing this diagnosis.

96.     Critically, Censeo instructed coders to code for this condition although the "diagnosis" was based on nothing more than the two described questions, which were plainly insufficient to support such a diagnosis.  Coders complied with Censeo's directions on a regular basis.

97.     Cachexia.  Censeo also instructed physicians to diagnose cachexia and malnutrition without adequate support.  Cachexia is extreme weakness and wasting of the body due to severe chronic illness.  Cachexia is not starvation, but is associated with physical deterioration resulting from other illnesses such as cancer, COPD, or HIV.  Cachexia was

considered a "high-value" diagnosis among the coders at Censeo and, thus, was frequently discussed.

98.    Censeo's assessment form instructed physicians and coders "involuntary weight loss of > 10% or BMI < 18, especially with empty refrigerator sign, may suggest malnutrition or cachexia."  The form prompted a diagnosis of either cachexia or malnutrition so long as the beneficiary fit these criteria.  Notably, Censeo's physicians were not provided with scales.  Instead, they would rely on the member's self-reported weight or prior weight history to complete this portion of the assessment form.

99.    If a Censeo-recruited physician routinely failed to diagnose either malnutrition or cachexia when the weight parameters were satisfied, Censeo's quality assurance team would call the physician and direct him or her that the entire section had to be completed on all future assessment forms.   In this way, Censeo's physicians were pressured to make a diagnosis of either cachexia or malnutrition whenever the weight parameters were satisfied.  Ramsey overheard these phone calls.  She specifically recalls members of the quality assurance team telling the doctors that they "had to pick one" of the two diagnoses – malnutrition or cachexia – and that they could not skip the section.

100.    These instructions were improper.   First, laymen should never be instructing a licensed medical physician to make a diagnosis.  Second, laboratory testing, in conjunction with clinical findings, is necessary in order to accurately diagnose malnutrition or cachexia.  It is never appropriate to code either malnutrition or cachexia based only on the two listed criteria.  At least two or more of the following characteristics are required to diagnose malnutrition:  insufficient energy intake; weight loss; loss of muscle mass; loss of subcutaneous fat; localized or generalized fluid accumulation that masks weight loss; and diminished

functional status as measured by hand grip strength.  Censeo physicians did not test for these symptoms; they merely asked the patients to report their weight.  Thus, there was no clinical evidence to support a diagnosis of cachexia or the corresponding code that Censeo submitted to CMS on behalf of its MAO clients.

101.    Censeo instructed coders to code for malnutrition or cachexia (1) whenever the assessed member's weight fell within the designated parameters even if the physician had failed or refused to make the diagnosis or (2) if the "diagnosis" made by the physician was predicated solely on the member's weight falling within the foregoing parameters without additional support.  Coders at Censeo and Altegra did as they were told.

102.    COPD.  Censeo instructed physicians to diagnose chronic obstructive pulmonary disease ("COPD"), another "high-value" diagnosis, without required testing.  COPD is most commonly diagnosed with a spirometer test, which involves breathing into a large hose connected to a spirometer machine.  The test measures how much air a patient's lungs can hold and how quickly a patient can expel air.

103.    Censeo's physicians did not carry a portable spirometer machine to in-home assessments and did not conduct spirometer tests.  Nor did they perform any other types of laboratory or diagnostic testing that could potentially be used to support a diagnosis of COPD, such as x-rays to rule out other diseases.

104.    Instead, Censeo's physicians diagnosed COPD based on nothing more than a patient's reported medical history, medications, and physical observations.  In fact, that is precisely what Censeo instructed its physicians to do.  The Censeo assessment form encouraged a diagnosis of COPD if the patient used oxygen, had a chronic cough, took "appropriate" medications, or showed other physical signs.  These observations alone cannot support a

diagnosis of COPD – least of all by a radiologist, which is not an appropriate specialty type to diagnose COPD.

105.    Likewise, Censeo instructed its and Altegra's coders to code for COPD whenever it was marked as "diagnosed" on the assessment form even though that diagnoses was not supported by required testing and the coders had no test results to support the diagnosis. The Censeo and Altegra coders complied with these instructions.

106.    Morbid obesity.    Censeo routinely instructed coders to code morbid obesity when it was marked as "diagnosed," even though a diagnosis of morbid obesity was never adequately supported by the information in the assessment form.

107.    Specifically, pursuant to ICD-9-CM Guidelines, body mass index ("BMI") cannot be the basis for coding morbid obesity unless the significance of the BMI is specifically documented. But Censeo instructed its physicians to diagnose morbid obesity if the patient had a BMI classification of 35-39 and "one related health risk or consequence," or if the patient had a BMI classification of 40 or greater. These instructions were explicit on the assessment form. Notably, there was no space on the assessment form to indicate the nature of the "one health risk or consequence" associated with the insured's BMI, and, as a matter of practice, that information was not documented. Instead, the "morbid obesity" diagnosis was checked any time the foregoing BMI parameters were satisfied and, as a routine matter, Altegra and Censeo coders would code for morbid obesity on this improper basis alone.

108.    Alcohol dependence.    Alcohol dependence was routinely coded pursuant to Censeo's improper instructions, even when it was not diagnosed on the assessment form. The assessment form posed four questions for MAO members who drink alcohol: (1) Have you ever thought you should cut down on your drinking? (2) Have you ever felt annoyed by others

criticizing your drinking? (3) Have you ever felt guilty about your drinking? (4) Do you have a morning "eye opener"?  The form then instructed that "[t]wo or more positive answers strongly suggest alcohol dependence and should be diagnosed."  As a matter of practice, if any two of the foregoing questions were answered affirmatively, coders would code for alcohol dependence even if it was not diagnosed by a physician.

109.    Myocardial infarction.  Ramsey also observed that myocardial infarction would be coded based solely on a member's oral report that she had experienced one or more symptoms of myocardial infarction.  This was true even though the Censeo physician did not perform any diagnostic testing, and even though the member had not been treated for myocardial infarction within the applicable reporting period.

110.    Cystic fibrosis.  Ramsey also observed that Altegra's coders routinely "picked up" the code for cystic fibrosis without any justification at all. Patients with cystic fibrosis typically have significantly shorter life expectancy than the average person, and, in the era in which Medicare Advantage members grew up, rarely survived beyond the age of 40. Thus, it would be unusual – almost unheard of – for a member currently eligible for Medicare Advantage to suffer from cystic fibrosis. Nonetheless, Altegra's coders regularly coded for the condition without diagnostic support, and those codes were routinely submitted to CMS.

111.    Diabetic retinopathy.  The Censeo form prompted physicians to diagnose diabetic retinopathy, even though the testing required to make such a diagnosis was not performed.  A diagnosis of diabetic retinopathy requires an eye examination called a fundoscopy. A proper fundoscopy exam is designed to detect abnormal blood vessels, swelling, blood or fatty deposits in the retina, growth of new blood vessels and/or scar tissue, bleeding into the vitreous, retinal detachment, and abnormalities of the optic nerve.  In a proper fundoscopic exam, a

physician views the dilated eye through an ophthalmoscope.  While the Censeo assessment form indicates that a fundoscopy might be performed, in practice they were often not performed at all.

112.    Censeo's physicians objected to diagnosing diabetic retinopathy, and often flat-out refused to perform a fundoscopy on the ground that, in the context of a home visit and without dilation, the fundoscopy could not be used to support a valid diagnosis.  Ramsey overheard the members of Censeo's quality control team contact resisting physicians by phone and instruct them that a fundoscopy must be performed at the in-home assessments for the purpose of diagnosing diabetic retinopathy.  The physicians generally complied with these demands.

113.    Further, pursuant to CMS requirements, diabetic retinopathy must be diagnosed by an "acceptable physician specialty type" – *i.e.*, an optometrist or ophthalmologist. (*E.g.*, April 2015 Final Call Letter; see also CMS Manual Trans. 118, Section 120.1.1.)  As noted above, most of Censeo's physicians were radiologists, often with absolutely no experience diagnosing eye disease.

114.    Notwithstanding the absence of proper testing to support a diagnosis of diabetic retinopathy, Censeo instructed Altegra and Censeo coders to code for the condition. They routinely did so, although neither the diagnosis nor the resultant code was properly supported.

115.    Censeo also instructed Censeo and Altegra coders to rely on unsupported data in the assessment forms.  By way of example, Censeo instructed coders to refer to the prepopulated, historical laboratory data if looking to confirm current treatments.  However, this section of the assessment form did not indicate the purpose of any laboratory testing and, as

noted above, coders were not provided with underlying clinical data.  Thus, coders could not rely on such information when coding.

        **D.**      **Censeo's Assessment Form is Questioned and its Coding Practices Are Challenged.**

       116.    In or around early July 2013, Commonwealth, an MAO that used Censeo's services, retained a third party, Pop Health Management ("Pop Health"), to evaluate Censeo's standard in-home assessment form.  As a result of that evaluation and its own observations, Commonwealth properly expressed concern that Censeo's in-home assessment might not pass a CMS audit.

       117.    Among other things, Commonwealth and Pop Health made the following troubling observations to the Censeo Defendants: (i) there was very minimal, if any, meaningful documentation as to how a reported condition was monitored, evaluated, assessed/addressed or treated; and (ii) Censeo's assessment form was "staged such that clinicians can select codes that already exist, and at a high level of specificity" which "could lead to over-coding."

       118.    Commonwealth's Chief Quality Officer, a physician, also evaluated the assessment form and expressed concern that: (i) the "completed assessment forms" were "not acceptable to be sent to the patient's [primary care physician] as evidence of a good assessment"; and (ii) the "placement of the preloaded medication and diagnosis list … seems to encourage rapid and rather superficial review and less than adequate documentation."  Commonwealth memorialized these concerns in a memorandum that was shared with Ramsey, as well as with Defendants Greve, Dambro and Ridlehuber.

       119.    Like Commonwealth, all of the MAOs had copies of Censeo's assessment forms. After coding the assessments for submission to CMS, it was Censeo's practice to provide each MAO, including Humana and Tufts, with electronic copies of the assessments completed

for that MAO's members.  Thus, each MAO, including Humana and Tufts, was well aware of the very deficiencies that Commonwealth identified, or would have been with the exercise of any degree of diligence.

120.    Further, as described above, Humana was provided with Censeo's Coding Manual, as prepared by Ridlehuber. That Coding Manual memorialized certain of Censeo's pre-existing improper coding policies.  Among other things, it clearly reflected the fact that Censeo had all along been instructing coders to "pick up" codes from the medication list alone, and without a supporting medical diagnosis.

121.    Commonwealth was not the only MAO to question Censeo's practices. Ramsey was aware that Defendant Tufts expressed concerns about Censeo's coding policies and practices as well.  Tufts became concerned with Censeo's work and requested a copy of Censeo's "coding Policies and Procedures" in July 2013.  Defendant Greve communicated this request to Ramsey and Defendant Ridlehuber on July 17, 2013.  Thereafter, Censeo provided Tufts with the Coding Manual.  Nonetheless, Tufts continued to use Censeo for coding purposes until 2015.

122.    Even before learning about Commonwealth's critical comments, Ramsey and certain of Censeo's coders and auditors questioned Censeo's assessment form for some of the very same reasons.  Like Commonwealth, they were concerned that Censeo's assessment form was designed to lead Censeo physicians and coders to choose unsupported high-risk diagnoses.

123.    On one occasion, Censeo's in-house coding auditors went directly to Defendant Dambro to express their concerns.  Shortly thereafter, Ridlehuber called the auditors into her office and instructed them that they were never again to approach Dambro directly to voice such concerns.

124.    The Censeo Defendants thus made it clear to Ramsey, the coders, and the coding auditors that Censeo's improper practices were not to be questioned.  Censeo was only interested in increasing the number of diagnoses coded and reported to CMS on behalf of its client MAOs, thereby artificially inflating risk scores and capitation payments, all in direct violation of Medicare regulations.

125.    Ramsey had more years of coding experience than any other Censeo employee. As part of her responsibilities as lead coder and, later, as Coding Manager, Ramsey interfaced directly and daily with the coders.

126.    Ramsey advised Censeo's coders, the vast majority of whom were apprentices, that it was improper to report diagnosis codes that were not adequately supported due to a lack of laboratory or diagnostic testing and/or other clinical evidence.  Ramsey's advice was contrary to the training that Censeo provided to the coders.

127.    Ramsey also instructed the coders that coding off the medication list alone was improper.  For instance, Ramsey specifically advised coders that she would not code a chronic condition like uncontrolled diabetes based only on the medications that a patient was reported to be using.  That advice was also contrary to Censeo's stated policy of coding off the medication list alone, a policy that was conveyed to the coders by Censeo's coding trainer as well as by Defendant Ridlehuber, and was memorialized in Censeo's Coding Manual, which the Censeo Defendants each approved.

128.    On August 8, 2013, Defendant Ridlehuber met directly with Censeo's coders.  Ridlehuber hosted a "Coding Lunch and Learn" class with the coders, which Ramsey did not attend. Ramsey later learned that the coders who attended the meeting had informed Ridlehuber that Ramsey was advising the coders that she would not code based off the

medication list alone and that the coding should be based on and supported by diagnoses that were, in turn, supported by laboratory or diagnostic testing, and/or other appropriate clinical evidence. Thus, the Censeo Defendants learned that Ramsey was challenging Censeo's compliance with Medicare regulations.

129.    The very next day – on August 9, 2013 – Censeo terminated Ramsey. When Ramsey inquired as to why she was being terminated, Defendant Greve, Censeo's Chief Compliance Officer, stated "we can no longer trust you."   Ramsey believes that Greve was referring to the fact that Ramsey had challenged Censeo's coding practices and, thus, could not be trusted to comply with those practices, or to keep quiet about other improper conduct by Censeo.

130.    Ramsey was also aware of other irregularities in Censeo's home assessment program.  Among other things, Censeo executives, including Ridlehuber and Greve, had confided in Ramsey that Censeo employees acting under the direction of Censeo employee Kari Dennis had added physician initials that were missing from patient records and had altered patient records to support higher HCC codes. Dennis was not terminated for such misconduct, but, instead, was assigned a new role as Censeo's Director of Operations - Client Services. Further, Ramsey knew that some physicians working for Censeo did not have up-to-date licenses.  It was clear to Ramsey that the Censeo Defendants no longer trusted Ramsey to keep such improper conduct to herself.

131.    Notably, Ramsey had been promoted to Coding Manager and received a $10,000.00 raise on July 11, 2013, just one month before she was abruptly terminated.

132.    As a result of Censeo's improper practices, the number of in-home assessments completed by Censeo rose dramatically. On May 1, 2013, Censeo announced that

the Company would complete twice as many assessments in 2013 as it completed in 2012.  In fact, Censeo announced that its "clients propelled the Company into a record-setting first quarter, increasing the number of evaluations completed year over year by 250 percent." As a result, the diagnosis codes submitted to CMS by Censeo number in the millions, and its clients include several of the largest MAOs in the United States.

133.    Censeo has contracted with at least 30 MAOs to provide these "home assessments." Humana was Censeo's largest MAO customer in 2013, and, upon information and belief, continues to be.  Tufts was also a significant MAO customer of Censeo at the time Ramsey was fired, and, upon information and belief, continued to be so until well into 2015.

134.    With the MAOs realizing enormous financial benefits associated with Censeo's "in-home assessments," Censeo has grown rapidly. Censeo's May 1, 2013 announcement stated that "revenue growth . . . is projected to reach $120 million in 2013, 140 percent year-over-year increase from 2012."

135.    In March 2013 the co-founder of Censeo, Jack McCallum, announced that each of Censeo's in-home assessments could mean an additional $2,000 to $4,000 in reimbursements for each MAO.  In January, 2013, Censeo announced that it performed 140,000 assessments in 2012, which translates to a minimum of $280,000,000 in additional reimbursements to the MAOs based on McCallum's claim.  Further, McCallum also stated that he anticipated performing 250,000 assessments in 2013, yielding a minimum increase in reimbursements of $500,000,000 to Censeo's MAO customers.

## VI.    DEFENDANTS VIOLATED FEDERAL RULES AND REGULATIONS AND THE MAOS OBTAINED OVERPAYMENTS FROM THE GOVERNMENT.

136.    Each of Censeo's coding practices and policies described above violated the requirement that "[d]iagnoses must be supported by appropriate medical record

documentation." (CMS 2013 National Technical Assistance Risk Adjustment 101 Participant Guide, Section 3.2.4.)  Among other things, CMS is clear that alternative data sources, such as prescriptions, cannot be used as substitutes for a physician's actual diagnosis of a condition:

> The MA organization may not, however, use ADS [Alternative Data Sources] as substitutes for documenting diagnoses from a hospital/physician. As in all diagnoses submitted, there must be medical record documentation to support the diagnosis as having been documented as a result of a hospital inpatient stay, a hospital outpatient visit, or a physician face-to-face visit during the data collection period. For example, a prescription for an ACE inhibitor, alone, is not considered sufficient for the sole data source of 'clinical evidence' of congestive heart failure (CHF); instead, the medical record needs to document an appropriate clinician's diagnosis of CHF during the data collection period (e.g., where an 'appropriate clinician' is a physician/nurse practitioner/physician assistant.").

(RADV Participant Guide, Section 3.2.4.)

137.    Censeo's coding practices and policies described above also violated the requirements that risk adjustment data submitted for purposes of calculating Medicare Advantage capitation payments be coded in compliance with ICD-9-CM Guidelines, as set forth in the CMS Manual § 40, CMS Manual Trans. 118, and the CMS RADV Participant Guide and described in paragraphs 38-47 above.

138.    Censeo's coding of risk adjustment data (which the MAOs authorized and permitted) also violated CMS's requirement that MAOs must "ensure that diagnoses are from acceptable data sources."  (CMS Manual § 40.)   Nor did the data created by CMS satisfy the same standards as similar types of data that would be submitted for fee-for-services reimbursement, which federal regulations also require.

139.    After coding, Censeo knowingly provided inaccurate and false coding predicated on the home assessments to the MAOs for submission to CMS, or, in the majority of cases, Censeo itself converted the uploaded codes to CMS's risk adjustment processing system

("RAPS") on behalf of its MAO clients.  In the case of Humana and Tufts, both of those Defendants knowingly authorized and permitted Censeo to submit codes directly to CMS on their behalf and, thus, held Censeo out to CMS as their designated agent.  As a downstream entity, Altegra also functioned as an agent of Humana and Tufts.

140.  As described in paragraphs 29-47 above, however, federal regulatory provisions, as well as their contractual obligations to CMS, require that Humana and Tufts remain fully responsible for the accuracy, truthfulness and completeness of all risk adjustment data submitted by Censeo on their behalf.  Indeed, Humana and Tufts committed to CMS that they would ensure Censeo's compliance with federal regulations and requirement, as set forth in 42 C.F.R. § 422.504(i).  Thus, Humana and Tufts retained control over Censeo and represented to CMS that they retained control over Censeo.

141.  Censeo and the other Defendants knowingly created unsupported Medicare diagnoses codes for submission to CMS.  Further, Censeo, with the MAOs' knowledge and at their direction, knowingly submitted those unsupported diagnoses codes to CMS for risk adjustment purposes.  Censeo acted at all times to serve the interests of Tufts and Humana when it improperly created and coded unsupported diagnoses, and submitted false risk adjustment data to CMS.

142.  All Defendants were fully aware that the codes did not comply with federal rules and regulations, even though such compliance and certification of such compliance were express prerequisites to the MAOs receiving capitation payments from the Government.

143.  As described in paragraphs 29-47 above, each time that the MAOs requested a monthly payment under their respective contracts with CMS, the MAOs were required, as a condition of receiving payment, to certify that the risk adjustment data submitted

by or on behalf of such MAO under 42 C.F.R. § 422.310 is accurate, complete, and truthful. Accordingly, each and every claim for a monthly payment by Humana and Tufts to CMS predicated on the submission of Censeo-generated risk adjustment data to the Government was a false claim, as it was premised upon risk adjustment data that was knowingly inaccurate, incomplete, and not truthful.

144.    A form of the required attestation is copied below:

ATTESTATION OF RISK ADJUSTMENT DATA INFORMATION RELATING TO CMS PAYMENT TO A MEDICARE ADVANTAGE ORGANIZATION

Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services (CMS) and (INSERT NAME OF MA ORGANIZATION), hereafter referred to as the MA Organization, governing the operation of the following Medicare Advantage plans (INSERT PLAN IDENTIFICATION NUMBERS HERE), the MA Organization hereby requests payment under the contract, and in doing so, makes the following attestation concerning CMS payments to the MA Organization. The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization or additional benefit obligations of the MA Organization and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution.

The MA Organization has reported to CMS during the period of (INDICATE DATES) all (INDICATE TYPE - DIAGNOSIS/ENCOUNTER) risk adjustment data available to the MA Organization with respect to the above-stated MA plans. Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.

Thus, with each submission, Humana and Tufts certified the accuracy of the risk adjustment data and acknowledged that such data "directly affects" the Government's capitation payments.

145.    In each instance, the MAOs' certifications were knowingly false.  Among other things, as described in paragraphs 48-135, the MAOs had copies of Censeo's assessments and Censeo's Coding Manual, documents which memorialized Censeo's improper practices,

including, *inter alia*, (i) coding from medications alone; and (ii) instructing licensed physicians to make certain diagnoses. Tufts even expressed concern about Censeo's policies.  Yet, both Tufts and Humana allowed improper and inaccurate risk assessment data to be submitted to CMS on their behalf and collected monthly payments from CMS predicated on such improper and inaccurate data.

146.    The records that Defendants created were material to a false or fraudulent claim in that they were utilized to improperly increase the number of reported diagnoses that the MAOs submitted to CMS (or which Censeo submitted on their behalf), thereby artificially inflating the respective risk scores assigned to the members of the MAOs.  This, in turn, improperly increased the capitation payments that CMS made to the MAOs, including Humana and Tufts.

147.    As a direct result of Censeo's improper coding policies and practices, which Altegra and the Censeo Defendants adopted and implemented, Censeo submitted unsupported and inaccurate risk adjustment data to CMS, causing CMS to assign artificially high-risk adjusted scores to the MAOs' members.  Further, Censeo, Humana and Tufts knowingly made false certifications to CMS as a condition to receiving payments from CMS. Thereafter, the MAOs, including Humana and Tufts, necessarily received inflated capitation payments from the Government, to which they were not entitled.  Thus, as a direct consequence of Defendants' submission of unsupported risk adjustment data and false certifications to CMS, the United States clearly made substantial overpayments to both Humana and Tufts.

148.    MAOs have a statutory obligation to report and return any overpayment received from the Government.  42 U.S.C. § 1320a-7k(d).  Further, federal regulations are clear that MAOs like Humana and Tufts are required to report and return both overpayments that they

have identified and overpayments that they "should have determined through the exercise of reasonable diligence" were made by CMS.  42 C.F.R. 422.326(c).  The law is clear that any overpayment retained after the statutory deadline is an "obligation" for purposes of 31 U.S.C. § 3729.  42 U.S.C. § 1320a-7k(d)(4)(B) (defining overpayments); 42 C.F.R. 422.326(e).  On information and belief, Humana and Tufts  never reported or returned such overpayments to the Government.

## COUNT I

### (Violations of 31 U.S.C. § 3729(a)(1)(A) & (B)  of the Federal False Claims Act – the Censeo Defendants)

149.    Paragraphs 1-148 of the Complaint are incorporated into this paragraph as though fully set forth herein.

150.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729-32, as amended.

151.    31 U.S.C. § 3729(a) provides, in relevant part, liability for:

(1)    any person who –

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)    conspires to commit a violation of subparagraph (A) [or] (B) ….

152.    Through the acts described above and herein, the Censeo Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(A).

153.    Through the acts described above and herein, the Censeo Defendants knowingly made or used or caused to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(B).

154.    As described in greater detail above, the Censeo Defendants implemented a policy of diagnosing and coding for unsupported, high-risk diagnoses; they instructed Censeo's physicians to diagnose unsupported high-risk conditions; they instructed Altegra and Censeo coders to code for these unsupported, high-risk diagnoses; and the coders routinely did so, although such diagnoses codes did not comply with federal rules and regulations.

155.    Censeo submitted improper and inaccurate risk adjustment data on behalf of Humana, Tufts and its other MAO clients to the Government for the purpose of increasing the MAO's claims for capitation payments.   The Censeo Defendants also caused the MAOs, including Humana and Tufts, to certify the false risk adjustment data and, thus, to submit false claims to the Government.   The Censeo Defendants knew that the risk adjustment data Censeo created and submitted on behalf of the MAOs, including Humana and Tufts, was false and unsupported; or they were deliberately ignorant of the truth or falsity of said claims; or they acted in reckless disregard of whether such risk adjustment data was false.

156.    The United States Government, unaware of the falsity of the records, statements and claims created, made, used, presented or caused to be made, used or presented by the Censeo Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of the Censeo Defendants and their agents as alleged herein.

157.    Censeo was required to, and did, certify the accuracy, completeness and truthfulness of all risk assessment data that it submitted to the Government on behalf of Humana

and Tufts as a condition precedent to the Government's making monthly capitation payments to Humana and Tufts.   By reason of the Censeo Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

WHEREFORE, Relator Becky Ramsey-Ledesma requests that judgment be entered in Plaintiff's favor and against the Censeo Defendants for actual damages, treble damages and civil penalties, and attorneys' fees and costs, and that the Court award any additional relief it deems appropriate.

## COUNT II

## (VIOLATIONS OF 31 U.S.C. § 3729(A)(1)(A) & (B) OF THE FEDERAL FALSE CLAIMS ACT – ALTEGRA)

158.    Paragraphs 1-157 of the Complaint are incorporated into this paragraph as though fully set forth herein.

159.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729-32, as amended.

160.    31 U.S.C. § 3729(a) provides, in relevant part, liability for:

(1)    any person who –

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

161.    Through the acts described above and herein, Altegra knowingly caused to be presented, false or fraudulent claims for payment or approval by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(A).

162.    Through the acts described above and herein, Altegra knowingly made or used, or caused to be made or used, false records or statements material to false or fraudulent claims  in violation of 31 U.S.C. § 3729(a)(1)(B).

163.    On behalf of Censeo and Censeo's MAO clients, Altegra created risk adjustment data for submission to the United States Government to support reimbursement payments to those MAO clients through Medicare, knowing that the risk adjustment data it was creating did not comply with Medicare rules and regulations.  Altegra knew that Censeo and the MAOs intended to, and did, submit false risk adjustment data to the Government based on these unsupported diagnoses codes, for the purpose of increasing the MAO's capitation payments.

164.    Altegra knew that the risk adjustment data that it created was false and unsupported; or it was deliberately ignorant of the truth or falsity of said claims; or it acted in reckless disregard of whether said claims were true or false.

165.    The United States Government, unaware of the falsity of the risk adjustment data that Altegra created to support the MAOs' submissions of claims for payment to the Government, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Altegra and their agents as alleged herein.  Thus, the false and unsupported risk adjustment data created by Altegra was material to the Censeo Defendants' and the MAO's claims.

166.    By reason of Altegra's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

WHEREFORE, Relator Becky Ramsey-Ledesma requests that judgment be entered in Plaintiff's favor and against Altegra for actual damages, treble damages and civil

penalties, and attorneys' fees and costs, and that the Court award any additional relief it deems appropriate.

## COUNT III

## (VIOLATIONS OF 31 U.S.C. § 3729(A)(1)(A), (B) & (G) OF THE FEDERAL FALSE CLAIMS ACT – HUMANA)

167.    Paragraphs 1-166  of the Complaint are incorporated into this paragraph as though fully set forth herein.

168.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729-32, as amended.

169.    31 U.S.C. § 3729(a) provides, in relevant part, liability for:

(1)    any person who –

   (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

   (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

   (C)    conspires to commit a violation of subparagraph (A), (B) . . . . or

   (G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

170.    Through the acts described above and herein, Humana knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(A).

171.    Through the acts described above and herein, Humana knowingly made or used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

172.    Through the acts described above and herein, Humana knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

173.    Pursuant to federal regulations and its own contract with CMS, Humana was responsible for compliance with federal rules and regulations notwithstanding that it subcontracted to Censeo the performance of certain of its contractual obligations to CMS. Further, Humana affirmed its ongoing direct responsibility to CMS by expressly certifying the accuracy of the risk adjustment data that Censeo created and submitted to CMS as a condition to receiving payment of its monthly capitation payments.

174.    Humana knew, or should have known, that the risk adjustment data Censeo created and submitted to the Government on its behalf and as its agent, on which it based its claims for payment, was false and unsupported; or it was deliberately ignorant of the truth or falsity of said data and the claims it submitted based on such data; or it acted in reckless disregard of whether such data was true or false, or whether the claims it submitted to the Government on the basis of such data were true or false.  Humana knowingly presented false claims to the Government and received payments from the Government to which it was not entitled.

175. The United States Government, unaware of the falsity of the records, statements and claims that Humana knowingly created, made, used, presented or caused to be created, made, used or presented, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Humana and its agents, as alleged herein.

176. Further, Humana never reported any overpayments to the Government resulting from the false claims that it had submitted. Thus, Humana knowingly made, used and/or caused to be made or used false records and statements for the purpose of concealing, avoiding or decreasing its obligation to return such overpayments to the Government.

177. By reason of Humana's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

178. In addition, at all relevant times, Humana contracted with Censeo to perform in-home assessments and to either directly complete the coding described herein, and/or to oversee third-party entities in doing so. Further, as described above, Humana retained Censeo to submit the risk adjustment data directly to CMS and Censeo did so. Humana's contract with Censeo was required to include the requirements set forth in 42 C.F.R. § 422.504(i).

179. As a result of the foregoing, Humana retained the capacity to assess Censeo's performance, provide instructions to Censeo, and terminate its relationships with Censeo.

180. By subcontracting with Censeo, Humana gave Censeo the authority to: (i) send physicians to members' homes; (ii) create what purported to be medical records for those members; (iii) derive Medicare diagnoses codes from those documents; (iv) transmit those codes to CMS for use in calculating the  monthly capitation payments to be made to Humana; and (v)

certify to CMS, as a condition to Humana's receipt of monthly capitation payments, the accuracy, completeness and truthfulness the risk adjustment data.

181.     Humana held Censeo out to CMS as its agent and designated Censeo as the entity to whom it delegated the right to submit Medicare diagnoses codes.  Humana also committed to CMS that it would ensure Censeo's compliance with federal regulations and requirements, as set forth in 42 C.F.R. § 422.504(i).   Thus, Humana retained control over Censeo, represented to CMS that it retained control over Censeo, and CMS had reason to believe that Censeo was authorized to act on Humana's behalf vis-à-vis CMS.

182.     Thus, Censeo had actual and/or apparent authority to perform as an agent on behalf of Humana, and to hold itself out to CMS as Humana's agent.

183.     Censeo served Humana's interests when it created false and unsupported risk adjustment data and submitted that data to CMS, in violation of the False Claims Act. Specifically, Censeo created and submitted false and unsupported risk adjustment data for the purpose of obtaining inflated capitation payments for Humana.

184.     By reason of Censeo's violations of the False Claims Act as described in Count I of this Second Amended Complaint, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.  Humana is vicariously liable for Censeo's violations of the False Claims Act, as further described in Count I of this Second Amended Complaint.

WHEREFORE, Relator Becky Ramsey-Ledesma requests that judgment be entered in Plaintiff's favor and against Humana for actual damages, treble damages and civil penalties, and attorneys' fees and costs, and that the Court award any additional relief it deems appropriate.

## COUNT IV

### (VIOLATIONS OF 31 U.S.C. § 3729(A)(1)(A), (B) & (G) OF THE FEDERAL FALSE CLAIMS ACT – TUFTS)

185.    Paragraphs 1-184 of the Complaint are incorporated into this paragraph as though fully set forth herein.

186.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729-32, as amended.

187.    31 U.S.C. § 3729(a) provides, in relevant part, liability for:

(1)    any person who –

   (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

   (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

   (C)    conspires to commit a violation of subparagraph (A), (B) . . . . or

   (G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

188.    Through the acts described above and herein, Tufts knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(A).

189.    Through the acts described above and herein, Tufts knowingly made or used, or caused to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(B).

190.    Through the acts described above and herein, Tufts knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

191.    Pursuant to federal regulations and its own contract with CMS, Tufts was responsible for compliance with federal rules and regulations notwithstanding that it subcontracted to Censeo the performance of certain of its contractual obligations to CMS. Further, Tufts affirmed its ongoing direct responsibility to CMS by expressly certifying the accuracy of the risk adjustment data that Censeo created and submitted to CMS as a condition to receiving payment of its monthly capitation payments.

192.    Tufts knew, or should have known, that the risk adjustment data Censeo created and submitted to the Government on its behalf and as its agent, on which it based its claims for payment, was false and unsupported; or it was deliberately ignorant of the truth or falsity of said data and the claims it submitted based on such data; or it acted in reckless disregard of whether such data was true or false, or whether the claims it submitted to the Government on the basis of such data were true or false.  Tufts knowingly presented false claims to the Government and received payments from the Government to which it was not entitled.

193.    The United States Government, unaware of the falsity of the records, statements and claims that Tufts knowingly created, made, used, presented or caused to be created, made,  used or presented, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Tufts and its agents, as alleged herein.

194.     Further, Tufts never reported any overpayments to the Government resulting from the false claims that it had submitted.  Thus, Tufts knowingly made, used and/or caused to be made or used false records and statements for the purpose of concealing, avoiding or decreasing its obligation to return such overpayments to the Government.

195.     By reason of Tufts' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

196.     In addition, at all relevant times, Tufts contracted with Censeo to perform in-home assessments and to either directly complete the coding described herein, and/or to oversee third-party entities in doing so.  Further, as described above, Tufts retained Censeo to submit the risk adjustment data directly to CMS  and Censeo did so.  Tufts' contract with Censeo was required to include the requirements set forth in 42 C.F.R. § 422.504(i).

197.     As a result of the foregoing, Tufts retained the capacity to assess Censeo's performance, provide instructions to Censeo, and terminate its relationships with Censeo.

198.     By subcontracting with Censeo, Tufts gave Censeo the authority to: (i) send physicians to members' homes; (ii) create what purported to be medical records for those members; (iii) derive Medicare diagnoses codes from those documents; (iv) transmit those codes to CMS for use in calculating the  monthly capitation payments to be made to Tufts; and (v) certify to CMS, as a condition to Tufts' receipt of monthly capitation payments, the accuracy, completeness and truthfulness the risk adjustment data.

199.     Tufts held Censeo out to CMS as its agent and designated Censeo as the entity to whom it delegated the right to submit Medicare diagnoses codes.  Tufts also committed to CMS that it would ensure Censeo's compliance with federal regulations and requirements, as set forth in 42 C.F.R. § 422.504(i).  Thus, Tufts retained control over Censeo, represented to

CMS that it retained control over Censeo, and CMS had reason to believe that Censeo was authorized to act on Tufts' behalf vis-à-vis CMS.

200.    Thus, Censeo had actual and/or apparent authority to perform as an agent on behalf of Tufts, and to hold itself out to CMS as Tufts' agent.

201.    Censeo served Tufts' interests when it created false and unsupported risk adjustment data and submitted that data to CMS, in violation of the False Claims Act. Specifically, Censeo created and submitted false and unsupported risk adjustment data for the purpose of obtaining inflated capitation payments for Tufts.

202.    By reason of Censeo's violations of the False Claims Act as described in Count I of this Second Amended Complaint, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.  Tufts is vicariously liable for Censeo's violations of the False Claims Act, as further described in Count I of this Second Amended Complaint.

WHEREFORE, Relator Becky Ramsey-Ledesma requests that judgment be entered in Plaintiff's favor and against Tufts for actual damages, treble damages and civil penalties, and attorneys' fees and costs, and that the Court award any additional relief it deems appropriate.

## COUNT V

### (FOR VIOLATION OF 31 U.S.C. § 3729(A)(1)(C) – AGAINST ALL DEFENDANTS)

203.    Paragraphs 1-202 of the Complaint are incorporated into this paragraph as though fully set forth herein.

204.    The Defendants, and each of them, violated 31 U.S.C. § 3729(a)(1)(C) by knowingly conspiring to violate various provisions of the False Claims Act.

205.   Defendants knowingly conspired to violate 31 U.S.C. § 3729(a)(1)(A) by, among other things, intentionally submitting false or fraudulent risk adjustment data to the Government in order to support false claims for monthly capitation payments that Humana and Tufts submitted to the Government, and for which they received payment. The Defendants knowingly conspired to generate and submit false or fraudulent claims to the Government predicated on diagnosis codes that were not adequately supported by actual medical records; or derived from diagnostic information generated by *bona fid*e physical examinations.

206.   As described above, the Defendants also violated 31 U.S.C. § 3729(a)(1)(C) by knowingly conspiring to violate 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records or statements material to a false or fraudulent claim.  The assessment forms created by Censeo, and the diagnostic codes derived therefrom, were false and unsupported. Defendants knew and agreed that those false codes would be presented to the Government to support the MAOs' false or fraudulent claims for inflated capitation payments.

207.   In addition to the foregoing, the Defendants also violated 31 U.S.C. § 3729(a)(1)(C) by knowingly conspiring to violate 31 U.S.C. § 3729(a)(1)(G), by knowingly making, using, or causing to be used or made, false records or statements material to obligations to pay or transmit monies to the Government, and by knowingly and improperly conspiring to avoid an obligation to repay the Government overpayments realized from the false or fraudulent claims submitted by or on behalf of the Censeo MAOs.  As a result of Defendants' concealments and use of false or fraudulent records and statements, Medicare paid more to the MAOs than it would have if the Censeo Defendants, Altegra and the MAOs, including Humana and Tufts, had

properly and truthfully reported only the diagnoses codes that were properly supported in accordance with applicable Medicare regulations.

208.     By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

209.     As a result of such conduct, each conspiring Defendant is liable to the Government for (i) three times the amount of damages sustained by the Government as a result of Defendants'  conspiracy to violate 31 U.S.C. § 3729; and (ii) a civil penalty equal to between $5,000 and $10,000 per violation.  31 U.S.C. § 3729.

210.     As a private litigant pursuing a *qui tam* case, Relator is entitled to recover a percentage of the proceeds of any recovery against Defendants by or on behalf of the United States (whether by judgment, settlement or otherwise), together with her attorney's fees, costs and expenses (such attorneys' fees, costs and expenses to be awarded against the Defendants) pursuant to 31 U.S.C. § 3730(d).

WHEREFORE, Relator Becky Ramsey-Ledesma requests that judgment be entered in Plaintiff's favor and against all Defendants for actual damages, treble damages and civil penalties, and attorneys' fees and costs, and that the Court award any additional relief it deems appropriate.

## **TRIAL BY JURY**

Plaintiff/Relator hereby demands a trial by jury as to all issues triable by jury.

Respectfully Submitted:

ROBERT CLARY,  PLLC
and GOLDBERG KOHN LTD.


By: */s/ Roger A. Lewis*
    Robert Clary
    ROBERT CLARY, PLLC
    7110 McKamy Boulevard
    Dallas, Texas  75248
    State Bar No. 04325300

    Matthew K. Organ, *Admitted Pro Hac Vice*
    Roger A. Lewis, *Admitted Pro Hac Vice*
    Stephanie J. Harris, *Admitted Pro Hac Vice*
    GOLDBERG KOHN LTD.
    55 East Monroe Street
    Suite 3300
    Chicago, Illinois  60603
    (312) 201-4000

    ATTORNEYS FOR PLAINTIFF
    AND QUI TAM RELATOR

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on November 25, 2015, he caused a true and correct copy of this **SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF,** to be served via the Court's ECF/electronic mailing system upon all counsel of record.


*/s/ Roger A. Lewis*