# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| *ex rel.* BECKY RAMSEY-LEDESMA, | § | |
| | § | |
| Plaintiff/Relator, | § | |
| | § | |
| v. | § | Civil Action No. 3:14-CV-00118-M |
| | § | |
| CENSEO HEALTH, L.L.C., | § | |
| MARK DAMBRO, JAMES EDWARD | § | |
| BARRY GREVE, JR., JOY RIDLEHUBER, | § | |
| ALTEGRA HEALTH, INC., HUMANA, | § | |
| INC., TUFTS HEALTH PLAN MEDICARE | § | |
| PREFERRED, TUFTS ASSOCIATED | § | |
| HEALTH PLANS, INC. d/b/a TUFTS | § | |
| HEALTH PLAN MEDICARE PREFERRED, | § | |
| and TUFTS ASSOCIATED HEALTH | § | |
| MAINTENANCE ORGANIZATION, INC., | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are four separate Motions to Dismiss Relator's Second Amended

Complaint, filed by (1) Humana, Inc.; (2) Altegra Health, Inc.; (3) Tufts Associated Health

Maintenance Organization, Inc., Tufts Associated Health Plans, Inc., and Tufts Health Plan

Medicare Preferred (collectively "Tufts"); and (4) Censeo Health, L.L.C., Mark Dambro,

James Edward Barry Greve, Jr., and Joy Ridlehuber (collectively, the "Censeo Defendants").

For the reasons stated, Humana's Motion (ECF No. 83) is GRANTED; Altegra's Motion

(ECF No. 86) is DENIED; Tufts' Motion (ECF No. 88) is GRANTED; and the Censeo

Defendants' Motion (ECF No. 90) is GRANTED in part and DENIED in part.

## BACKGROUND

Relator Becky Ramsey-Ledesma filed this *qui tam* action on behalf of the United

States under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*, alleging that

Defendants engaged in a fraudulent scheme to create and submit false claims for payment

under the Medicare Advantage ("MA") program.[1]

### THE MEDICARE ADVANTAGE PROGRAM

Under Medicare Part C, eligible beneficiaries may elect to receive Medicare benefits

through private health insurers. *See generally*, 42 U.S.C. § 1395w-21. This alternative to the

traditional fee-for-service Medicare program is the MA program. The Centers for Medicare

and Medicaid Services ("CMS") administers the MA program and contracts with private

insurers, which are known as "MA organizations," to provide coverage to beneficiaries

enrolled in the MA program. The contract between the MA organization and CMS requires

the MA organization to comply with all applicable federal laws, regulations, and CMS

instructions, specifically including the FCA and all laws and regulations designed to prevent

fraud, waste, and abuse. 42 C.F.R § 422.504.

CMS pays to MA organizations a fixed monthly payment, per individual enrollee, for

medical services, irrespective of the amount of services an enrollee actually uses. *See id.* §

1395w-23(a)(1); *see also* 42 C.F.R. § 422.304. The monthly payment, which is known as a

"capitated payment," is adjusted by CMS based on "risk adjustment data" reported by MA

organizations, including information on their members' ages, genders, health and disability

---

[1]  All the facts set forth in this Opinion are taken from the allegations contained in the SAC. *See Manguno v. Prudential Prop. and Cas. Ins. Co.*, 276 F.3d 720, 725 (5th Cir. 2002) (stating that when reviewing a motion to dismiss under Rule 12(b)(6), "all facts pleaded in the complaint must be taken as true.")

statuses, and whether members are receiving treatment or care in an institutional setting, such as a hospital or skilled nursing facility. *See* 42 U.S.C. § 1395w-23(a)(1)(C); *see also* 42 C.F.R. §§ 422.308, 422.310. The capitated payments are prospective; that is, CMS uses risk adjustment data from the prior year to establish payments for the following year. 42 C.F.R. §§ 422.308(c), (e), 422.310(g). The model on which CMS compensates MA organizations assumes that MA organizations having higher-risk insured members will be required to pay more for their insureds' medical care.  Thus, MA organizations having more high-risk insureds are compensated at a higher level than MA organizations whose insured members are relatively healthier.

MA organizations report risk adjustment data to CMS in the form of various codes, including diagnosis codes that describe their members' medical conditions. *See* 42 C.F.R. § 422.310(b). CMS guidelines require that MA organizations use accurate diagnosis codes that conform to the ICD-9-CM Guidelines for Coding and Reporting. *See* Medicare Managed Care Manual Ch. 7. Regulations governing the MA program further require that the diagnosis codes be supported by properly documented medical records. *See* 42 C.F.R. § 422.310(e). Additionally, MA organizations must certify, as a condition to receiving monthly payments, that the risk adjustment data provided to CMS, including diagnosis codes, is accurate, complete, and truthful, based on an MA organization's "best knowledge, information, and belief." *See* 42 C.F.R. § 422.504(l).

Federal regulations allow MA organizations to subcontract with third-party vendors to do the work they are required to perform under the organizations' contract with CMS. If an MA organization subcontracts with another entity to generate claims data, the regulations require that the subcontractor certify, based on its best knowledge, information, and belief,

3

"the accuracy, completeness, and truthfulness" of the data that will be used for the purposes

of obtaining reimbursement from the Government. 42 C.F.R. § 423.505(k)(3). The MA

organization, however, maintains "ultimate responsibility" for adhering to and fully

complying with all terms and condition of their contracts with CMS.  *Id.* § 423.505(i).

## THE FALSE CLAIMS ACT

The FCA authorizes an individual to bring a suit on behalf of the United States

against anyone who submits to the Government a false claim for payment. *Gonzalez v.*

*Fresenius Medical Care North America*, 689 F.3d 470, 475 (5th Cir. 2012) (quoting *Hughes*

*Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 941 (1997)). Such an individual,

known as the relator, may recover against a person who:

(A)    knowingly presents, or causes to be presented, to the United States Government a false or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; or

(C)    conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

31 U.S.C. §§ 3729(a)(1)(A)-(C). Additionally, a defendant may be liable for a "reverse false

claim" if the defendant makes or uses a false record or statement for the purpose of avoiding

or decreasing an obligation to pay money owed to the Government. *See* 31 U.S.C.

§3729(a)(1)(G).

## RELATOR'S ALLEGATIONS

In her Second Amended Complaint ("SAC"), which is the live pleading in this action,

Relator alleges that she is an experienced Certified Professional Coder, who worked for

Censeo as a "lead" coder from March 2013 until she was terminated on August 9, 2013, after

4

she allegedly challenged Censeo's practices in providing risk adjustment services to MA

organizations. *See* SAC ¶¶ 12, 55, 129. While she was employed by Censeo, it contracted

with MA organizations, including Humana and Tufts, to gather and code risk adjustment data

for their use in making claims to CMS for capitated payments. *See id.* ¶ 4. Censeo also

subcontracted with Altegra to code risk adjustment data for Human and Tufts. *See id.* ¶ 33.

Relator alleges that Censeo devised a scheme to inflate risk adjustment scores for MA

members, to generate higher capitated payments. *Id.* ¶ 1. As part of the scheme, Censeo

allegedly hired unqualified physicians to conduct in-home assessments of MA members and

diagnose high-risk conditions, based on little more than historical data provided about the

individual members by the MA organizations themselves. *Id.* at ¶¶ 6, 48, 66. Censeo also

allegedly hired inexperienced medical coders, including employees of Altegra, and instructed

them to convert the information obtained from the assessments into codes that Censeo

submitted to CMS on behalf of its MA clients, as part of the risk adjustment data used to

calculate the MA organizations' capitated payments. *Id.* at ¶¶ 8, 48. Humana and Tufts

allegedly received millions of dollars in capitated payments to which they were not entitled,

because risk adjustment data for their members was based on improper and unsupported

high-risk diagnosis codes. *See id.* ¶¶ 1, 10, 72. Relator alleges that Humana and Tufts were

aware of and approved Censeo's scheme, and that all Defendants falsely certified that the

risk adjustment data submitted to CMS was accurate, complete, and truthful. *Id.* ¶¶ 29-47,

59-62, 119, 121, 143.

    Based on this conduct, Relator asserts claims under the FCA (1) against the Censeo

Defendants for creating and submitting false risk adjustment data to CMS, and for causing

Humana and Tufts to falsely certify the accuracy of the risk adjustment data to CMS, in

violation of Section 3729(a)(1)(A) & (B); (2) against Altegra for creating false risk adjustment data and for causing Censeo to submit that data to CMS, in violation of Section 3729(a)(1)(A) & (B); and (3) against Humana and Tufts for causing Censeo and Altegra to create and submit false risk adjustment data to CMS and for falsely certifying the accuracy of the risk adjustment data to CMS, in violation of Section 3729(a)(1)(A) & (B), as well as for making "reverse false claims," in violation of Section 3729(a)(1)(G). Relator also asserts claims against all the Defendants for conspiracy to violate the FCA, in violation of Section 3729(a)(1)(C). Defendants filed four separate motions to dismiss Relator's claims under Fed. R. Civ. P. 12(b)(6) and 9(b), arguing that the SAC fails to plead any FCA violation with sufficient particularity. The issues have been fully briefed, and the motions are ripe for determination.

## LEGAL STANDARDS

To state a cause of action under the FCA, Relator must plead the following elements: (1) a false statement or fraudulent course of conduct; (2) that was made or carried out with the requisite scienter; (3) that was material; and (4) that caused the Government to pay out money. *See United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260 (5th Cir. 2014); *see United States ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 717 (N.D. Tex. 2011) (applying same elements to both false presentment and false record theories). To meet the scienter requirement, Relator must plead that Defendants acted with knowledge of the falsity of the statement, which is defined, at a minimum, as acting "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(iii).

Relator's FCA allegations must satisfy both the plausibility pleading standard of Fed. R. Civ. P. 8 and the heightened pleading standard of Fed. R. Civ. P. 9(b). *See United States*

*ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). Relator must "(1) plead

'enough facts [taken as true] to state a claim to relief that is plausible on its face,' and (2)

plead 'with particularity the circumstances constituting fraud or mistake,' although '[m]alice,

intent, knowledge, and other conditions of a person's mind may be alleged generally.'" *Id.* A

claim is plausible if "the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged. The plausibility

standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully." *Bollinger Shipyards*, 775 F.3d at 260

(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim generally satisfies the

particularity standard of Rule 9(b) when the plaintiff pleads the time, place, and contents of

the false representation and the identity of the person making the representation. *See Grubbs*,

565 F.3d at 190. In the context of the FCA, however, a claim can meet Rule 9(b)'s standard

if it alleges "particular details of a scheme to submit false claims paired with reliable indicia

that lead to a strong inference that claims were actually submitted." *Id.*

## ANALYSIS

Relator alleges that Defendants violated the FCA in four ways:

> (1) Defendants allegedly presented false or fraudulent claims, or
> caused false or fraudulent claims to be presented to CMS, in order
> to increase the capitated payments to Humana and Tufts;

> (2) Defendants created, used, or caused to be created or used,
> false risk adjustment data and certifications for the purpose of
> generating improperly inflated capitated payments to Humana
> and Tufts;

> (3) each Defendant conspired and agreed to participate in a
> scheme to create and submit false risk adjustment data to generate
> higher capitated payments to Humana and Tufts than were

7

otherwise due them, and to allow Humana and Tufts to retain those overpayments; and

(4) Defendants made or used, or caused to be made or used, documents material to Humana's and Tufts' obligations to return overpayments they received, and Humana and Tufts failed to return those overpayments after they became aware, or should have been aware, that the payments were improper.

Defendants contend Relator has failed to allege sufficient facts to state a viable claim for relief under any of the theories asserted.

The Court addresses each of Relator's theories in turn.

<u>FALSE PRESENTMENT CLAIMS AGAINST CENSEO, THE INDIVIDUAL
DEFENDANTS, ALTEGRA, HUMANA, AND TUFTS</u>

The FCA's false presentment provision makes liable any person who "knowingly presents, or causes to be presented" a false claim to the Government. 31 U.S.C. § 3729(a)(1)(A). This provision requires an express presentment. *Wall*, 778 F. Supp. 2d at 716. A relator asserting such a cause of action may satisfy Rule 9(b) by alleging (1) the details of an actually submitted false claim, or (2) "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190. Here, it is undisputed that the SAC does not identify any specific false claims that one or more of the Defendants actually submitted to CMS. Relator must therefore satisfy Rule 9(b) by pleading particular details of an alleged scheme to submit false claims to the Government and allegations stating a likelihood that false claims were actually submitted. *See id.*

*Censeo*

Censeo contends that the SAC fails to sufficiently allege the "who, what, when, where, and how" of a false presentment claim. *See* Censeo Mot. (ECF No. 91) at 11-13. As

8

the Fifth Circuit has recognized, however, the "time, place, contents, and identity" standard is not a straightjacket for Rule 9(b). *Grubbs*, 565 F.3d at 190. Rather, the rule is context specific and flexible. *Id.* Indeed, the standard for stating a claim for relief with particularity is lower in the FCA context than it is in the securities or common law fraud contexts. *Wall*, 778 F. Supp. 2d at 715 (citing *Grubbs*, 565 F.3d at 188-89).

In the SAC, Relator alleges that Censeo hired physicians – mostly radiologists –  to conduct in-home medical assessments for members of its MA clients, including Humana and Tufts. SAC ¶ 6. Censeo allegedly provided those physicians with assessment forms that had been prepopulated with information about the MA members, including medical and prescription medication histories. *Id.* ¶¶ 6, 64. Relator alleges that Censeo instructed those physicians to diagnose high-risk conditions, based on information provided in the prepopulated assessment forms and during cursory physical examinations they conducted of members, which lasted only 45 minutes to an hour. *See Id.* ¶¶ 6, 48, 57, 67. Relator further alleges that the conditions reflected on the individual assessment forms were not actual diagnoses; instead, they reflected the MA member's self-reported conditions, or conditions captured from the medical history that had not been confirmed by the member or a physician. *See id.* ¶ 69.

Censeo allegedly incentivized and pressured the physicians to complete as many assessments as possible, in as little time as possible. *Id.* ¶ 70. Relator alleges that Censeo assigned each physician to conduct up to ten in-home assessments in geographically dispersed areas on the same day. *Id.* Censeo allegedly paid the physicians only $100 per assessment, and did not reimburse the physicians for gas or mileage. *Id.* Relator also alleges that the physicians were often otherwise unemployed or underemployed and were required to

make diagnoses that were unrelated to their areas of practice. *Id.* ¶ 71. Relator alleges that CMS's guidelines do not recognize radiologists, who conducted many of the examinations, as acceptable specialists for diagnostic purposes with respect to many of the conditions encountered during the in-home assessments. *Id.*

Relator further alleges that Censeo instructed those physicians to record the high-risk diagnoses on the assessment forms, even though such diagnoses were not confirmed by necessary laboratory results or diagnostic testing. *Id.* ¶¶ 7, 48, 72. For example, Relator alleges that Censeo instructed physicians to diagnose spinal stenosis, based solely on a MA member's answers to questions about numbness and weakness in their arms, legs, and feet, without obtaining diagnostic imaging, such as x-rays, CT scans, or MRIs to confirm the diagnosis. *Id.* ¶¶ 94-95. Censeo also allegedly instructed physicians to diagnose chronic obstructive pulmonary disease ("COPD"), without requiring a spirometer test, based on nothing more than the doctor's observations that the MA member used oxygen or had a chronic cough. *Id.* ¶¶ 102, 104.

Relator alleges that during the five-month period she was employed by Censeo, she witnessed members of Censeo's quality control team pressure physicians to make unsupported diagnoses. *Id.* ¶¶ 73, 99. For example, Relator alleges that Censeo's assessment form prompts physicians to diagnose either cachexia or malnutrition when a member reports "involuntary weight loss of > 10% or BMI < 18." *Id.* ¶ 98. Relator alleges that she overheard phone calls from members of Censeo's quality assurance team to physicians who did not routinely diagnose either cachexia or malnutrition merely because Censeo's weight and/or BMI parameters were satisfied. *Id.* ¶ 99. According to Relator, Censeo's quality assurance

team members told the physicians that, if such parameters were satisfied, they "had to pick one" of the two diagnoses – cachexia or malnutrition – on the assessment form. *Id.* ¶ 99.

Relator further alleges that Censeo hired and instructed medical coders to convert information captured on assessment forms to diagnosis codes, which codes Censeo subsequently submitted to Medicare on behalf of its MA clients, as part of the risk adjustment data used to calculate capitated payments. *See id.* ¶¶ 8, 48, 74, 88. Censeo allegedly instructed its in-house coders, as well as coders employed by third-party vendor Altegra, to assign high-risk diagnosis codes to MA members, even though the physicians' diagnoses of major medical conditions were plainly not supported by the medical records. *Id.* ¶¶ 48, 83-112. In particular, Relator alleges that she observed Censeo's coders record diagnoses for diabetic retinopathy, chronic major depression, spinal stenosis, and COPD, because they were marked as diagnosed on the assessment form, despite the absence of important confirming medical evidence in the records. *Id.* ¶¶ 8, 88-89, 96, 101, 105.

Further, Censeo allegedly instructed its in-house and third-party coders to attribute undiagnosed conditions to MA members by examining the medications listed on the assessment forms and picking a diagnosis for a high-risk condition that might correlate with a particular medication, even if a physician did not diagnose that condition. *Id.* ¶¶ 9, 74, 75. For example, Relator alleges that Censeo instructed its coders to code for rheumatoid arthritis whenever a patient was prescribed NSAIDs, which are general pain medications used to treat a variety of less serious conditions, such as headaches. *Id.* ¶ 9.

Relator alleges Censeo's coding trainer orally instructed coders to code from the medication list alone, stating "Don't make things harder than they are – go straight to the medication list." *Id.* ¶ 76. *Id.* ¶¶ 78, 79, 101. Relator alleges that when coders did not know

which high-risk condition a medication might treat, they would "google" the listed medication, substituting the results of that internet search for an actual diagnosis by a physician. *Id.* Relator also alleges that Censeo's assessment form specifically directed that certain medications were "supportive" of high-risk diagnoses. *Id.* ¶ 80. Relator alleges that the form instructed coders that diuretics, ACE inhibitors, angiotensin-receptor blockers, and digoxin "are supportive for" congestive heart failure, and that ACE inhibitors, statins, and advice to avoid NSAIDs "are supportive for" chronic kidney disease. *Id.* Censeo's forms thus allegedly guided coders to code for high-risk diagnoses from prescribed medications alone. *Id.*

Relator alleges that Censeo submitted millions of diagnosis codes to CMS, on behalf of its MA clients. *Id.* ¶¶ 132-34, 147. According to Relator, the unsupported diagnosis codes artificially inflated the respective risk scores assigned to individual MA members, which, in turn, improperly increased the capitated payments paid by CMS to Censeo's clients, including Humana and Tufts. *Id.* ¶ 146. Relator alleges that, as a condition to receiving capitated payments, Censeo certified, and caused its MA clients to certify, that the risk adjustment data submitted to CMS was accurate. These certifications were allegedly false because the diagnosis codes that formed the basis of the risk adjustment data were unsupported and incorrect. *Id.* ¶¶ 32, 34, 143, 155, 173.

Relator further alleges that Censeo promoted that each of its in-home assessments could mean an additional $2,000 to $4,000 in reimbursements for each MA organization. *Id.* ¶ 135. In January 2013, prior to the date Relator became a Censeo employee, Censeo allegedly announced that it had performed 140,000 assessments in 2012. *Id.* Thus, Relator contends, Censeo's scheme allegedly boosted reimbursements for its MA clients by

$280,000 in 2012. *Id.* Censeo allegedly predicted it would perform 250,000 assessments in 2013, thus yielding a possible $500,000 increase in reimbursements to Censeo's MA clients. *Id.*

Viewed as a whole, and taken as true, these allegations satisfy Rule 9(b) with respect to Relator's FCA false presentment claim against Censeo. The SAC details a scheme by which Censeo allegedly presented false claims to CMS on behalf of its MA clients, in the form of unsupported diagnostic codes and inaccurate risk adjustment data, for the purpose of improperly inflating capitated payments to Censeo's clients. Relator alleges she had first-hand experience with the scheme when she was employed by Censeo as a coder for five months during 2013. She lays out details, allegedly drawn from her personal observations, about Censeo's in-home assessment program, and she provides several examples of allegedly improper instructions given by Defendant Ridlehuber, the quality control team, and Censeo's coding trainer to physicians and medical coders.

Censeo reads the Rule 9(b) standard too narrowly. The SAC is not fatally deficient because it does not provide a specific date or location when and where any allegedly false diagnosis was made or any allegedly false code was entered, nor because it does not name a physician who made an allegedly false diagnosis or a coder who entered an allegedly false code. *See Grubbs*, 565 F.3d at 190; *see also, e.g., United States ex rel. Swoben v. United Health Care Ins. Co.*, 2016 WL 4205941, at * 13 (9th Cir. Aug. 10, 2016) (rejecting a Rule 9(b) challenge to a complaint in a *qui tam* action involving MA organizations, even though the relator did not identify specific dates on which the alleged fraud occurred or specific medical codes that were improperly submitted to CMS). Here, Relator alleges she personally observed the conduct she contends violates the FCA, between March and August 2013. She

identifies specific conditions that were allegedly diagnosed and coded in the absence of

necessary testing, and other conditions that were coded in the absence of any diagnosis at all.

Relator also names as a Defendant, Joy Ridlehuber, a key Censeo executive who acted in

furtherance of the scheme. In the context of this FCA case, Relator's allegations against

Censeo are adequate to satisfy Rule 9(b). *See United States ex rel. Tucker v. Christus Health*,

2012 WL 5351212, at *4 (S.D. Tex. Oct. 23, 2012) (finding that relator satisfied Rule 9(b) by

naming individuals who participated in submitting the allegedly false claims to Medicare,

and describing the manner in which the Medicare billing was false and/or fraudulent,

specifying the time period during which the false claims were submitted to Medicare,

providing specific examples of each category of fraudulent billing, and explaining that

Defendants received millions of dollars thereby, even though she did not identify each false

bill by date and patient name, nor identify each individual who participated in submitting the

false bills to Medicare).

      Censeo also argues that Relator has not sufficiently pleaded falsity. It argues that

high-risk conditions reported in the risk adjustment data are based on the physicians' clinical

judgments, and an FCA complaint about the exercise of physicians' professional clinical

judgments must be predicated on the presence of objectively verifiable facts at odds with the

exercise of such judgment. Censeo contends that falsity, or lack of accuracy, regarding a

diagnosis, cannot be based on Relator's speculation that the physicians made erroneous

professional judgments based on the members' medical records. It further contends that the

medical criteria for diagnosing a condition and the criteria for coding a diagnosis are separate

considerations, and that the failure of a medical diagnosis to conform to coding criteria does

not make the diagnosis false. According to Relator, however, the high-risk diagnosis codes

reported by Censeo were, in many cases, false because the codes were not based on any

diagnosis by a doctor, but instead were created by non-physician coders drawing medical

conclusions from the completed assessment forms. *See id.* ¶¶ 9, 74, 75, 78, 79, 80, 101.

Relator claims that Censeo's coders in effect "diagnosed" MA members with high-risk

conditions, in the absence of *any* professional medical diagnosis. The allegedly false

statement in this regard is not merely diagnosing high-risk conditions in the absence of

laboratory tests that other doctors, in the exercise of their professional judgment, may deem

necessary for a diagnosis, but rather that they did so without any physician involvement at

all. Under this theory, Relator has sufficiently pleaded falsity.

The Censeo Defendants' Motion is therefore DENIED with respect to Relator's false

presentment claim against Censeo.

*The Individual Defendants*

The Court comes to a different conclusion with respect to Relator's false presentment

claim against Defendants Dambro and Greve. Relator identifies Dambro as Censeo's Chief

Medical Officer, and Greve as Censeo's General Counsel and Chief Compliance Officer.

SAC ¶¶ 22, 23. However, Relator only generally alleges that Dambro and Greve "participated

in the development and enforcement of Censeo's improper coding practices and policies."

SAC ¶ 58. With respect to Dambro, Relator alleges that he "reviewed and approved" the

coding manual and was "was largely responsible for authoring the assessment form." *Id.* ¶¶

59, 65. As to Greve, Relator alleges that he similarly "reviewed and approved" the coding

manual and "also contributed to the content of the assessment form." *Id.* These conclusory

allegations fail to provide sufficient detail about these Defendants' alleged role in the

scheme. The SAC provides no indication of what contribution either Defendant made to the

assessment form. Further, the SAC does not allege that the coding manual caused the submission of false claims. To the contrary, Relator alleges that, during the time she was employed by Censeo, "the coders had no written manual setting out Censeo's coding procedures. Ridlehuber's 'Coding Manual' was never distributed to the coders while [Relator] was employed by Censeo." *Id.* ¶ 76.

By contrast, Relator alleges sufficient facts to state a claim against Ridlehuber, Censeo's Director of Quality. *See Grubbs*, 565 F.3d at 191-92. Among other things, Relator alleges that Ridlehuber instructed Censeo's coders on how to determine codes from nothing more than prescription medication lists. SAC ¶¶ 77, 127. Ridlehuber also allegedly pressured Altegra coders to code for serious medical conditions, such as major chronic depression, in the absence of a diagnosis from an examining physician or other medical evidence in the records. *Id.* ¶¶50, 51. Relator alleges that during her five-month tenure with Censeo, she participated in meetings where Ridlehuber discussed Censeo's improper practices with Censeo's coders and third-party coders. *Id.* ¶ 56. She further alleges that the coders followed Ridlehuber's instructions and coded medical data from members' files with unsupported high-risk diagnosis codes submitted to CMS. *See id.* ¶ 77.

The Fifth Circuit has held that a complaint for violations of the FCA satisfies Rule 9(b) as to individual defendants where, as here, the complaint sets out "the particular workings of a scheme that was communicated directly to the relator by those perpetrating the fraud." *Grubbs*, 565 F.3d at 191. Relator does not allege Ridlehuber's actions occurred on a certain date or in a certain place, but it can be reasonably inferred from the facts alleged that the conduct occurred between March and August of 2013 at Censeo's office in Dallas. Relator further describes first-hand knowledge of the scheme and minimum sufficient details

about Ridlehuber's alleged improper activity to avoid dismissal of her claims against
Ridlehuber at this stage of the litigation. *Tucker*, 2012 WL 5351212, at *4.

The Censeo Defendants' Motion is therefore GRANTED with respect to Relator's
false presentment claim against Defendants Dambro and Greve, and DENIED as to Relator's
false presentment claim against Defendant Ridlehuber.

*Altegra*

Like the Censeo Defendants, Altegra contends that the SAC does not sufficiently
allege specific details of its participation in a scheme to submit false claims to the
Government. *See* Altegra Mot. (ECF No. 87) at 7-12. Altegra argues that the SAC is "bereft"
of particularized allegations regarding the "who, what, where, when, and how" of an FCA
violation. *See id.* at 8. As described above, however, in fact Relator has alleged particular
details of a fraudulent scheme to generate and cause the submission of inaccurate risk
adjustment data to CMS in order to inflate capitated payments to Censeo's MA clients, and
such allegations are sufficient to survive a Rule 9(b) challenge. The SAC is not fatally
deficient merely because it does not identify the particular false claims that were submitted.
*See Grubbs*, 565 F.3d at 190.

The key inquiry with respect to Relator's claims against Altegra is whether the SAC
sufficiently alleges Altegra's involvement in the alleged scheme. Although it is a close call,
the Court finds that Relator has alleged sufficient details of Altegra's role in the scheme to
survive dismissal. According to Relator, Altegra is a third-party vendor with which Censeo
contracted to review the assessment forms completed by Censeo's physicians and convert the
medical information contained therein to diagnosis codes that could be submitted by Censeo
to CMS on behalf of Censeo's MA clients. SAC ¶ 49. Relator alleges that Altegra operated

under Censeo's direction and followed Censeo's instructions to code unsupported diagnoses and undiagnosed conditions for inclusion in risk adjustment data reported to CMS. *See id.* ¶¶ 49, 74. Although Relator did not work for Altegra, the SAC states facts regarding Relator's personal knowledge of Altegra's activities, which provide reliable indicia that lead to a strong inference that Altegra participated in the alleged scheme.

Relator alleges she attended meetings and phone conferences with Ridlehuber and Altegra executives during which Censeo's coding practices were discussed in detail. *Id.* ¶¶ 50, 51. Relator claims that, despite its initial objections, Altegra agreed to follow Censeo's coding instructions and policies with regard to coding, which facilitated the alleged fraud. *Id.* Relator does not allege the specific date of such conversations, but the allegations of the SAC are specific enough to support the inference that they occurred during the five-month period in 2013 when Relator worked for Censeo. Realtor does not name any Altegra employee who participated in the alleged discussions; however, she does identify them by position or title, such as Altegra's coding department leads and the head of its information technology department. *Id.* ¶ 50.

Relator's allegations with respect to such conversations are sufficient to provide reliable indicia that Altegra generated codes from Censeo's assessment forms that it knew to be inaccurate. She alleges she participated in one discussion in which Ridlehuber pressured Altegra representatives to code diagnoses for major chronic depression solely on the basis of affirmative responses to the following two questions reflected in the assessment form: "Are you taking an antidepressant and, if so, were you sad or depressed before starting the antidepressant?" *Id.* ¶ 51. Relator alleges that chronic major depression cannot be diagnosed based solely on a person's responses to those two questions, and other causes for depressive

18

symptoms, such as substance abuse and bereavement, must be ruled out. *Id.* ¶¶ 91-92.

Relator further alleges that, even where depression is diagnosed, it cannot be automatically

inferred that such depression is a "major recurrent" type, as reflected in the codes utilized,

without additional information regarding the type of depression. *Id.* Altegra allegedly

challenged whether it was proper to code major chronic depression from diagnoses based

only on the patients' responses to two questions. *Id.* ¶ 51. However, the SAC claims

Ridlehuber persisted in her contention that this was proper and Altegra allegedly capitulated

and agreed to code for depression as Censeo urged. *Id.* Relator also alleges she participated

in phone conferences in which Altegra representatives told Ridlehuber that Altegra would

use special guidelines that were consistent with Censeo's instructions when it coded

Censeo's assessments. *Id.* ¶ 52. These allegations lead to a sufficiently strong inference that

Altegra generated codes it knew to be inaccurate, as part of a scheme to cause false claims to

be submitted to the Government.[2]

---

[2]  The Court does not find that Relator has sufficiently pleaded that Altegra itself submitted any allegedly false claims for reimbursement or certified any allegedly false claims. To the contrary, the SAC seems to disavow this theory with respect to Altegra.

> As a direct result of Censeo's improper coding policies and practices, which Altegra and the Censeo Defendants adopted and implemented, *Censeo submitted* unsupported and inaccurate risk adjustment data to CMS, causing CMS to assign artificially high-risk adjusted scores to the [MA organizations'] members. Further, *Censeo, Humana and Tufts knowingly made false certifications to CMS* as a condition to receiving payments from CMS.

SAC ¶ 147. *Compare id.* ¶ 155 ("*Censeo submitted* improper and inaccurate risk adjustment data on behalf of Humana, Tufts and its other [MA organization] clients to the Government for the purpose of increasing the [MA organization's] claims for capitation payments. *The Censeo Defendants also caused the [MA organizations], including Humana and Tufts, to certify the false risk adjustment data* and, thus, to submit false claims to the Government.") *with id.* ¶ 163 ("*On behalf of Censeo and Censeo's [MA Organization] clients, Altegra created risk adjustment data* for submission to the United States Government . . . . Altegra knew that *Censeo and the [MA organizations] intended to, and did, submit*

Altegra contends that Relator's allegations fail because the SAC merely "lumps" Altegra's alleged misconduct together with misconduct by Censeo and other third-party coding vendors. Allegations that lump all defendants together and fail to segregate the alleged wrongdoing of one from those of another do not satisfy Rule 9(b). *See In re Urcarco Securities Litigation*, 148 F.R.D. 561, 569 (N.D. Tex.1993), *aff'd*, 27 F.3d 1097 (5th Cir. 1994). Here, however, Relator does simply not lump Altegra and Censeo together. The SAC distinguishes between the two entities and describes the parties' relationship with each other and to the scheme. Relator alleges that Censeo created its assessment form, developed the allegedly improper coding practices, and instructed Altegra on how to follow its practices, playing the role of leader in the scheme, and Altegra was a follower, that reluctantly, but knowingly, implemented Censeo's improper coding practices. It is true that in connection with the actual coding, the SAC alleges that coders employed by Altegra and Censeo engaged in the same conduct, but that type of collective allegation, which describes the actions of multiple defendants alleged to have engaged in precisely the same conduct, is sufficient to satisfy Rule 9(b). *Swoben*, 2016 WL 4205941, at *13.

Altegra's contention that the SAC fails to "marshal any direct or circumstantial evidence of misconduct" does not compel a different result. Altegra Mot. at 1. Relator is not required to come forward with evidence at this stage of the proceedings. Rule 9(b) requires a type of *pleading*, which the Court finds is satisfied here. Altegra's Motion is therefore DENIED with respect to Relator's false presentment claim.

---

*false risk adjustment data to the Government* based on these unsupported diagnoses codes, for the purpose of increasing the [MA Organization's] capitation payments.").

*Humana and Tufts*

In contrast to her allegations against Censeo, Relator alleges only generally that Humana and Tufts participated in a scheme to submit false claims to CMS. The essence of her theory against these MA organizations is that because Humana and Tufts contracted with Censeo, and Censeo allegedly generated inaccurate risk adjustment data, Humana and Tufts knowingly engaged in the submission of false claims to CMS. The SAC, however, fails to set forth allegations against Humana or Tufts that are sufficiently specific to avoid dismissal.

The SAC contains very few allegations against Humana or Tufts, either separately or collectively. Relator alleges only that she participated in conferences with Ridlehuber and "the [MA organizations], including Humana and Tufts," during which Censeo's assessment form and coding practices were discussed, and that Humana and Tufts were thus "aware of" Censeo's improper coding practices. *Id.* ¶¶ 56, 61, 62, 66. Unlike the allegations involving Altegra, the SAC does not identify any individual – either by name or by title – who participated on behalf of either MA organization in any meeting or conversation about the challenged conduct. The SAC does not identify the specific content of any alleged meeting or conference or allege that the parties discussed any specific improper practice. The SAC also does not allege that Humana or Tufts endorsed or accepted any particular improper coding practice. Relator generally alleges that Humana and Tufts both requested and were provided with Censeo's coding manual, but she does not identify any person employed by either MA organization who received a Censeo coding manual, and she does not specifically allege that anyone actually reviewed or approved such a manual on behalf of Humana or Tufts. *Id.* ¶¶ 59-61. Relator does not sufficiently allege how the MA organizations knew the risk adjustment data was false. Unlike her claims against Censeo and Altegra, Relator's

21

claims against Humana and Tufts provide no reliable indicia that those MA organizations knowingly submitted false claims to CMS, or knew that Censeo was submitting false claims, as part of an illegal scheme to defraud the Government.

Relator's allegations against Humana and Tufts also "lump" the MA organizations together in a manner that does not satisfy the requirements of Rule 9(b). In almost every instance in the SAC, Relator attributes conduct to "Humana and Tufts." *See* SAC ¶¶ 1-2, 4-5, 11, 29-1, 33, 36, 39, 40, 42, 48, 50, 53-54, 56, 66, 119, 139-41, 143-48, 155, 157, 205, 207. In one instance, Relator alleges generally that Humana asked for a copy of Censeo's coding manual and was provided with a copy of a manual hastily-assembled by Ridlehuber, and that it was thus aware of Censeo's coding practices. *Id.* ¶¶ 59-61. In the next paragraph of the SAC, Relator makes almost identical allegations against Tufts: "Tufts also requested, and was provided with, a copy of the Coding Manual in July 2013. Thus, Tufts was also aware of the improper coding policies and practices that Censeo had been implementing on its behalf." *Id.* ¶ 62. Relator's allegations do not sufficiently segregate the alleged wrongdoing of one MA organization from the other. *In re Urcarco Securities Litigation*, 148 F.R.D. at 569; *United States ex rel. Barrett v. Johnson Controls, Inc.*, 2003 WL 21500400, at *11 (N.D. Tex. Apr. 9, 2003) (Lynn, J.). The SAC does not allege reliable indicia, specific to Humana and Tufts, individually, that either MA organization knew the risk adjustment data submitted to the Government by Censeo on their behalves was false.

Relator contends that Humana and Tufts are vicariously liable for the alleged fraudulent conduct of Censeo and Altegra, because Censeo and Altegra had actual and apparent authority to act as agents for MA organizations in generating diagnosis codes for submission to CMS. In the Fifth Circuit, a corporation may be vicariously liable under the

22

FCA for the acts of an employee, where the employee is acting within the scope of his employment and with the purpose of benefiting the employer. *United States v. Hangar One, Inc.,* 563 F.2d 1155, 1158 (5th Cir.1977); *United States v. Ridglea State Bank*, 357 F.2d 495, 500 (5th Cir. 1966). However, the Fifth Circuit has not expressly expanded these holdings to all agency relationships. Assuming Humana and Tufts could be liable for the actions of Censeo and Altegra under a vicarious liability theory, agency would be a necessary element of Relator's fraud claim and would have to be pleaded with particularity under Rule 9(b). *In re Enron Corp. Sec., Derivative & "ERISA" Litigation*, 540 F. Supp. 2d 759, 765 (S.D. Tex. 2007). Here, the SAC does not allege sufficient facts to establish an agency relationship between Humana or Tufts, on the one hand, and Censeo or Altegra, on the other. Instead, Relator only generally alleges that Humana and Tufts authorized Censeo to submit codes directly to CMS on their behalves and held Censeo out to CMS as their designated agent. *See* SAC ¶¶ 180-82, 196-201. Relator does not allege specific facts about the nature and terms of any alleged grant of authority in a manner that satisfies the requirements of Rule 9(b).

Humana's and Tufts' Motions are therefore GRANTED with respect to Relator's false presentment claim.

<u>FALSE RECORD/FALSE CERTIFICATION</u>

The FCA's false record provision imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). The creation of a false record, when it is made with the requisite intent, satisfies the statute. *See Grubbs*, 565 F.3d at 193. There is no additional presentment requirement. *Id.*; *Wall,* 778 F. Supp. 2d at 716. All that is required to

state a claim are "simple, concise, and particular allegations of the circumstances constituting

. . . fraud." *Grubbs*, 565 F.3d at 193.

Censeo and Altegra challenge Relator's false record claims on the same grounds they

raise to her false presentment claims: the SAC fails to allege sufficient "time, place, contents,

and identity" details. *See* Censeo Mot. at 20; Altegra Mot. at 7. However, Relator has

alleged, with sufficient detail, how Censeo instructed coders, including coders at Altegra, to

code undiagnosed conditions from patient assessment forms by examining the prescription

medications list and picking a diagnosis that might correlate with the medications prescribed,

even if a physician did not make that diagnosis. SAC ¶¶ 9, 74-75. Relator has further alleged

that, during her tenure at Censeo from March to August 2013, she regularly witnessed coders

performing in conformity with Censeo's instructions. *Id.* ¶¶ 78, 101. She alleges that she

personally overheard Altegra representatives tell Ridlehuber that Altegra had adopted

Censeo's coding practices. *Id.* ¶¶ 50, 51.

The SAC does not allege, with sufficient particularity, that Humana or Tufts certified

to CMS that the risk adjustment data submitted by Censeo was accurate, complete, or

truthful. Relator alleges "[e]ach and every claim for a monthly payment by Humana and

Tufts to CMS predicated on the submission of Censeo-generated risk adjustment data to the

Government was a false claim, as it was premised upon risk adjustment data that was

knowingly inaccurate, incomplete, and not truthful," and "with each submission, Humana

and Tufts certified the accuracy of the risk adjustment data and acknowledged that such data

'directly affects' the Government's capitation payments." *See id* ¶ 144; *see also id* ¶ 147

("Censeo, Humana and Tufts knowingly made false certifications to CMS as a condition to

receiving payments from CMS.") Just as with the false presentment claims, Relator's false

24

certification allegations against Humana and Tufts "lump" the MA organizations together in a manner that does not satisfy the requirements of Rule 9(b).

Therefore, Defendants' Motions are GRANTED with respect to Relator's §3729(a)(1)(B) claims against Humana and Tufts, but the Motions are DENIED with respect to Relator's § 3729(a)(1)(B) claims against Censeo and Altegra.

REVERSE FALSE CLAIM

The "reverse false claim" provision of the FCA imposes liability on a defendant who "knowingly makes, uses or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Under a reverse false claim theory, the defendant's actions do not necessarily result in an improper payment by the Government to the defendant, but rather result in no payment to the Government when a payment is required. *United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004). Where, as here, a relator alleges that a defendant failed to disclose and return an overpayment from the Government, liability under § 3729(a)(1)(G) requires proof of the following elements: (1) a false record is created; (2) the provider knows the record is false; (3) the false record or statement is made, used, or caused to be made or used; (4) to conceal, decrease, or avoid an obligation to pay the government; and (5) the misrepresentation is material. *United States ex rel. Ligai v. ETS-Lindgren, Inc.*, 2014 WL 4649885, at *12 (S.D. Tex. Sep. 16, 2014).

Relator asserts a reverse false claim theory against Humana and Tufts only. The essence of her claim is that these MA organizations had a duty to report and return any overpayments received from the Government. SAC ¶¶ 147-48. She argues that the allegations in the SAC regarding Censeo's alleged scheme are sufficient to create a strong

25

inference that false claims were knowingly presented; therefore, the same allegations are sufficient to further support the conclusion that overpayments were made to Humana and Tufts and that Humana and Tufts kept the overpayments. Rel. Resp. (ECF No. 100) at 66. Relator contends that each certification by the MA organizations of the accuracy, completeness, and truth of the risk adjustment data not only supported each request for payment, but also reaffirmed that no overpayments had been made. *Id.* at 68. However, a defendant's mere failure to refund false claims the Government paid is not actionable as a reverse false claim. *See, e.g., United States ex rel. Porter v. HCA Health Servs. of Oklahoma, Inc.*, 2011 WL 4590791, at *8 (N.D. Tex. Sep. 30, 2011) (citing *United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 514 (E.D. Pa. 2010)) (holding that reverse false claim that merely recasts a false statement claim is not actionable); *see also Ligai*, 2014 WL 4649885, at *13 (allegation that defendant is obligated to repay overpayments it received from the government fails to state a reverse false claim).

The purpose of a reverse false claim cause of action is to ensure that a person who makes a false statement to avoid paying money owed to the Government is equally liable under the FCA as if that person had submitted a false claim to receive money. *Thomas*, 708 F. Supp. 2d at 514. The reverse false claim provision of the FCA is thus intended to address conduct that would otherwise escape liability under the FCA, not to provide a duplicate basis to assert a false statement claim under the Act. *Id.* (citing *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 338-39 & n.142 (S.D.N.Y. 2004)). Here, Relator's reverse false claim merely alleges that Human and Tufts failed to refund capitated payments they were not entitled to receive. Thus, the claim is not separately actionable under § 3729(a)(1)(G).

Defendants Humana's and Tufts' Motions to Dismiss are GRANTED with respect to Relator's claim under § 3729(a)(1)(G).

CONSPIRACY

Relator also asserts that Defendants violated 31 U.S.C. ¶ 3729(a)(1)(C) by knowingly conspiring to violate the false presentment, false records, and reverse false claims provisions of the FCA. SAC ¶¶ 204-07. To prove a conspiracy, Relator must be able to show: (1) the existence of an unlawful agreement between the Defendants to violate the FCA, and (2) at least one act performed in furtherance of that agreement. *See United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008). "As part of that showing, the plaintiff must demonstrate that the defendants shared a specific intent to defraud the government." *Id.* Rule 9(b) applies to Relator's conspiracy claims. *Grubbs*, 565 F.3d at 193. Relator must therefore allege with particularity the conspiracy as well as the overt acts taken in furtherance of the conspiracy. *Id.*

The SAC pleads with sufficient particularity that Censeo and Altegra conspired to violate the FCA. As set forth above, Relator alleges that Censeo and Altegra had an agreement to generate improper and unsupported high-risk diagnosis codes for inclusion in risk adjustment data reported to CMS on behalf of Censeo's MA clients, and that both entities coded unsupported diagnoses and undiagnosed conditions. *See* SAC ¶¶ 49, 50, 51, 74. The SAC, however, fails to plead sufficient facts to state a claim for conspiracy under the FCA as to Humana and Tufts. Relator generally alleges that Humana and Tufts hired Censeo to generate risk adjustment data, and that Censeo and Altegra coded unsupported medical diagnoses and undiagnosed conditions from the assessment forms completed by Censeo's physicians. *See* SAC ¶¶ 4, 74, 78. Relator alleges that Censeo and Altegra submitted

27

inaccurate risk adjustment data based on the unsupported medical diagnoses and undiagnosed conditions "with the knowledge and consent of, and under the direction and supervision of, both Humana and Tufts." *Id.*, ¶ 48. However, Relator fails to plead any specific facts that would support the inference that Humana or Tufts had an actual agreement with Censeo or Altegra to create false records or present false claims to CMS. The SAC does not identify any particular person who entered into an agreement on behalf of Humana or Tufts; nor does it allege particular circumstances that would suggest a meeting of the minds. Relator's reliance on her allegations regarding the existence of an alleged scheme do not demonstrate that Humana or Tufts had an agreement to participate in the alleged scheme, and do not satisfy the Rule 9(b) standard. *See Grubbs*, 565 F.3d at 194 (holding that allegations that various doctors and a hospital submitted certain false claims, do not, by themselves, do more than point to a possibility of an agreement among the parties to violate the FCA).

Defendants Censeo's and Altegra's Motions to Dismiss are DENIED with respect to Relator's conspiracy claim; Defendants Humana's and Tufts' Motions to Dismiss are GRANTED with respect to Relator's conspiracy claim.

### Conclusion

The Motions to Dismiss filed by Humana and Tufts (ECF Nos. 83 and 88) are GRANTED in their entirety. The Censeo Defendants' Motion to Dismiss (ECF No. 90) is GRANTED, in part, with respect to Defendants Dambro and Greve. Relator's claims against these Defendants are DISMISSED under Fed. R. Civ. P. 9(b). However, because this is the first time Relator has had the benefit of the Court's analysis of the sufficiency of her pleading, Relator shall have until October 31, 2016 to replead these claims, to the extent she deems appropriate, in an effort to address the deficiencies identified in this Memorandum

Opinion and Order. If and when Relator files a Third Amended Complaint, she shall also attach a redlined copy as an exhibit.

In all other respects, Defendants' Motions are DENIED.


SO ORDERED.

Dated: September 30, 2016.

BARBARA M. G. LYNN
CHIEF JUDGE

29